NUMBER 13-00-335-CV




COURT OF APPEALS




THIRTEENTH DISTRICT OF TEXAS




CORPUS CHRISTI - EDINBURG


___________________________________________________________________



THE ED RACHAL FOUNDATION 

AND PAUL ALTHEIDE , Appellants,



v.




CLAUDE D'UNGER , Appellee.

___________________________________________________________________



On appeal from the 148th District Court


of Nueces County, Texas.


__________________________________________________________________



O P I N I O N




Before the Court En Banc


Opinion by Justice Rodriguez




 This is an employment case. Appellee, Claude D'Unger, filed suit against appellants, the Ed Rachal Foundation (the
Foundation), D'Unger's former employer, and Paul Altheide, the Foundation's chief executive officer (CEO). D'Unger
claimed breach of contract and wrongful termination against the Foundation and tortious interference with a contract
against Altheide. After a jury verdict and judgment entered in favor of D'Unger, this appeal ensued. By thirteen issues,
appellants generally contend: (1) the evidence was insufficient to support the jury's findings of breach of contract,
wrongful termination, tortious interference, and damages; (2) attorney's fees should not have been awarded; (3) there was
charge error; (4) certain testimony and unproduced documents were admitted in error; and (5) the trial subpoena of a
non-party was error. We affirm, in part, and reverse and render, in part.

I. 

Background The Foundation, a non-profit charitable organization, is an operating foundation. In order to maintain its
tax-exempt status, the Foundation must use its assets for non-exempt purposes; it is required to distribute five percent of
the market value of its assets each year to charities. At the time of the incidents that form the basis of this lawsuit, Altheide
was employed by the Foundation as Chief Financial Officer, and D'Unger had been hired as Vice-President of Exempt
Activities for the Foundation. In addition to being operation employees, Altheide and D'Unger were elected officers of the
Board, CEO and secretary, respectively.

 The Galvan Ranch (the Ranch) in Webb County, Texas, is one of the Foundation's assets. The Ranch extends over 67,000
acres and is bordered along a five-mile frontage by the Rio Grande River. The crossing of ranch property by non-United
States citizens is a common occurrence. Corpses of transients who had succumbed to the harsh environment had been
found in the vicinity of the Ranch.

 Beginning in January of 1998, D'Unger reported details of a September 17, 1997 handcuffing incident on the Ranch, and
his fears for the well-being of three teenage transient non-United States citizens, to nine separate local, state, and federal
agencies and officials. In his communications, D'Unger also expressed his concerns about Altheide's alleged self-dealing (1)
and other suspect activities of the Foundation. (2) D'Unger's communications with outside entities regarding the Foundation's
activities were against Altheide's express instructions not to do so.

 In April, Altheide learned of D'Unger's actions, and on April 13, 1998, Altheide suspended D'Unger's employment with the
Foundation. The suspension, however, did not affect D'Unger's status as a Board member. His compensation continued.
Throughout the suspension, D'Unger also continued to communicate with law enforcement and other agencies about the
Foundation's activities, and about what he contended were efforts to include him in a conspiracy to cover up criminal and
illegal conduct. 

 On August 10, 1998, Altheide asked D'Unger to resign. When D'Unger refused, Altheide fired him. D'Unger decided not
to submit his name for re-election as a director. The minutes of a special meeting held by the Board on August 11, 1998, 
reflect that the Board unanimously: (1) appointed operating officers, including Altheide as CEO but not including D'Unger
in any capacity; (2) amended the Foundation's by-laws to decrease the number of directors from five to four; and (3) ratified
the scope of Altheide's duties as chief executive officer. D'Unger was no longer a director, officer, or employee of the
Foundation.

II. Employment Contract Claim



 In its first issue, the Foundation asserts that the evidence is legally insufficient or, in the alternative, factually insufficient
to support the jury's finding that the Foundation agreed to an employment contract that limited its right to terminate
D'Unger.

A. Standard of Review

1. Legal Sufficiency Challenge

 Reviewing a legal sufficiency challenge, we consider only the evidence and inferences that support the finding. Lenz v.
Lenz, 79 S.W.3d 10, 19 (Tex. 2002);Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co., 766 S.W.2d 264, 276 (Tex.
App.-Amarillo 1988, writ denied). We disregard all evidence and inferences to the contrary. Lenz, 79 S.W.3d at 19;
Maxus, 766 S.W.2d at 276. Because the Foundation did not bear the burden of proof at trial on modification of D'Unger's
at-will status, Larson v. Family Violence & Sexual Assault Prevention Ctr. of S. Tex.,64 S.W.3d 506, 518 (Tex.
App-Corpus Christi 2001, pet. denied); Rios v. Tex. Commerce Bancshares, Inc., 930 S.W.2d 809, 814-15 (Tex.
App.-Corpus Christi 1996, writ denied), we analyze the Foundation's legal-sufficiency challenge as a no-evidence issue. 
Gooch v. Am. Sling Co., 902 S.W.2d 181, 183 (Tex. App.-Fort Worth 1994, no writ). The Foundation must show that the
record presents no probative evidence to support the adverse finding. Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex.
1983). 

 The evidence is no more than a scintilla and, in legal effect, is no evidence "[w]hen the evidence offered to prove a vital
fact is so weak as to do no more than create a mere surmise or suspicion of its existence." Kindred v. Con/Chem., Inc.,
650 S.W.2d 61, 63 (Tex. 1983). Conversely, more than a scintilla exists when the evidence "rises to a level that would
enable reasonable and fair-minded people to differ in their conclusions." Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 25
(Tex. 1994). We reverse and render judgment when we sustain a legal-sufficiency point. Vista Chevrolet, Inc. v. Lewis,
709 S.W.2d 176, 177 (Tex. 1986) (per curiam); Heritage Res., Inc. v. Hill, 104 S.W.3d 612, 619 (Tex. App.-El Paso 2003,
no pet. h.).

2. Factual Sufficiency Challenge

 Unlike legal-sufficiency challenges, factual-sufficiency issues concede that the record presents conflicting evidence on an
issue. Maxus, 766 S.W.2d at 275. Like legal-sufficiency challenges, the standard of review on factual-sufficiency issues
depends on the burden of proof at trial. Id. at 275. The party attacking a finding on which an adverse party bore the burden
of proof must show that the record presents "insufficient evidence" to support the finding. Gooch, 902 S.W.2d at 184. In
reviewing an insufficient-evidence issue, we examine and consider all of the evidence, not just the evidence that supports
the verdict, to see whether it supports or undermines the finding. Mar. Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07
(Tex.1998). We set aside the finding for factual insufficiency if the "evidence adduced to support the vital fact, even if it is
the only evidence adduced on an issue, is factually too weak alone to support it." See Ritchey v. Crawford, 734 S.W.2d 85,
86-87 n.1 (Tex. App.-Houston [1st Dist.] 1987, no writ) (quoting Robert W. Calvert, "No Evidence" and "Insufficient
Evidence" Points of Error, 38 Tex. L. Rev. 361, 366 (1960)).

 In attacking for factual insufficiency an adverse finding on which it bore the burden of proof at trial, a party must show
that the finding is against the "great weight and preponderance of the evidence." Maxus, 766 S.W.2d at 275; Ritchey,
734 S.W.2d at 86-87 n.1. In that event, we set aside a finding so against the overwhelming weight of the evidence as to be
manifestly unjust and clearly wrong. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam). 

 If we reverse a trial court's judgment on factual-sufficiency grounds, we detail all of the evidence relevant to the issue and
articulate why the finding is factually insufficient. Mar. Overseas Corp., 971 S.W.2d at 407. We reverse and remand for a
new trial when we sustain a factual-sufficiency point. Glover v. Tex. Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex. 1981)
(per curiam); Heritage Res., 104 S.W.3d at 619.

B. Analysis

 All employment relationships in Texas are presumed at will. Montgomery County Hosp. Dist. v. Brown, 965 S.W.2d 501,
502 (Tex. 1998). "[A]bsent a specific agreement to the contrary, employment may be terminated by the employer or
employee, for good cause, bad cause, or no cause at all." Id. Any modification of at-will employment must be based on an
unequivocal statement by the employer not to terminate the employee except under clearly specified circumstances. Byars
v. City of Austin, 910 S.W.2d 520, 523 (Tex. App.-Austin 1995, writ denied). One cannot imply the modification; it must
be express. Midland Judicial Dist. Cmty. Supervision & Corr. Dep't v. Jones, 92 S.W.3d 486, 487 (Tex. 2002)(per
curiam); Brown, 965 S.W.2d at 503-04. The agreement must directly limit, in a "meaningful and special way," the
employer's right to discharge the employee without cause. Larson, 64S.W.3d at 518. It is the burden of the discharged
employee who asserts that the parties have contractually agreed to limit the employer's right to terminate the employee to
prove an express agreement or written representation to that effect. Id. at 518; Rios, 930 S.W.2d at 814-15.

 As with all contracts, the parties to an employment agreement must negotiate and agree to its essential terms for the
agreement to be enforced. See Larson, 64 S.W.3d at 519; see also Smith v. SCI Mgmt. Corp., 29 S.W.3d 264, 268 (Tex.
App.-Houston [14th Dist.] 2000, no pet.) ("We find that such a general discussion about an employee's annual
compensation does not raise a fact issue as to whether the parties agreed to limit in a 'meaningful and special way' the
employer's prerogative to discharge the employee without cause."). Similarly, if an essential term of employment is open
for future negotiation, no binding contract is created. Mann v. Trend Exploration Co., 934 S.W.2d 709, 713 (Tex. App.-El
Paso 1996, writ denied).

 D'Unger testified that the Foundation entered into a renewable one-year employment agreement with him that the Board
ratified in 1996 and renewed in 1997. He pointed to by-laws and corporate minutes as evidence of the parties' oral
agreement. The Foundation's by-laws permitted employment of directors for the term of the director, which was annual,
and the corporate minutes recorded that D'Unger was hired at a salary of $80,000.00 per year. D'Unger testified that the
agreement to compensate him was for a term of a year, and that removal required an action of the Board. D'Unger's
statement of subjective belief that he entered into a contract with the Foundation is not evidence. See Cont'l Coffee Prods.
Co. v. Cazarez, 937 S.W.2d 444, 452 (Tex. 1996); see also In re Jones, 974 S.W.2d 766, 769 (Tex. App.-San Antonio
1998, orig. proceeding); see generally Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex. L. Rev.
361, 362-63 (1960).

 Furthermore, Scott Turner, a certified public accountant and D'Unger's expert witness, testified that the existence of an
annual renewable employment agreement between the Foundation and D'Unger was consistent with generally accepted
accounting practices and corporate governance standards regarding how corporate officers are employed and compensated. 
This testimony, that is consistent with D'Unger's understanding, did not provide what D'Unger's testimony lacked: 
evidence of a specific, unambiguous agreement. A conclusory statement, whether by a lay or expert witness, is not
evidence. Wadewitz v. Montgomery Hosp. Dist., 951 S.W.2d 464, 466 (Tex. 1997). The courts have considered evidence
of the prior practices of an employer with regard to a customary term of employment sufficient to support a finding of the
existence of an employment agreement:

 It is true that it was not expressly stipulated that the appellee should remain in the service one year, or for any definite
length of time; but the evidence shows that it was the custom of the corporation to employ a manager annually, and to
require of him a bond conditioned for the faithful performance of his duty. The jury had a right to conclude that, with a full
knowledge of this custom, the parties had it in mind and contracted with reference to that term of service.



Farmers' Union Co-Op. Clearance House of Rusk v. Guinn, 208 S.W. 362, 363 (Tex. Civ. App.-Texarkana 1919, no writ);
see Hoffrichter v. Brookhaven Country Club Corp., 448 S.W.2d 843, 846 (Tex. Civ. App.-Dallas 1969, writ ref'd n.r.e.). 
Turner, however, did not testify about the Foundation's specific custom or its practices in particular. He testified only that
D'Unger's understanding of the agreement between the parties was consistent with standard corporate practices. "Expert
opinions must be supported by facts in evidence, not conjecture." Marathon Corp. v. Pitzner, 106 S.W.3d 724, 729
(Tex.2003).

 D'Unger also argues that the Board's approval of his compensation based on an annual salary supplies the requisite
specificity to meet his burden of showing that the Foundation modified his at-will status. D'Unger asks this Court to apply
the "English Rule" that provides, "hiring at a stated sum per week, month, or year, is a definite employment for the period
named and may not be arbitrarily concluded." Winograd v. Willis, 789 S.W.2d 307, 310 (Tex. App.--Houston [14th Dist.]
1990, writ denied).

 The English Rule, however, is no longer viable. See Jones, 92 S.W.3d at 487. An agreement for an annual salary does not
modify an employee's at-will status. Id. A hiring based on an agreement of an annual salary does not limit the employer's
prerogative to discharge the employee during the dictated period of employment. Id. Thus, evidence that the Board
approved D'Unger's compensation calculated on an annual basis is not evidence that the Foundation agreed to modify
D'Unger's at-will status. See id.

 Stripped of the inference that approval of D'Unger's annual salary evidenced an agreement to a one-year term of
employment, neither D'Unger's testimony nor his expert's opinion established that the Foundation and D'Unger came to a
meeting of the minds that modified D'Unger's at-will status. See Larson, 64 S.W.3d at 519; see also SCI Mgmt. Corp., 29
S.W.3d at 268. No evidence in the record establishes that the Foundation agreed to a specific term of employment, and no
evidence establishes that the Foundation unequivocally indicated a definite intent to be bound not to terminate D'Unger's
employment except under clearly specific circumstances.

 Accordingly, we find that no more than a scintilla of evidence exists "that would enable reasonable and fair-minded people
to differ in their conclusions" about the existence of an employment agreement between the Foundation and D'Unger that
modified D'Unger's at-will status. See Moriel, 879 S.W.2d at 25. Evidence that the Foundation agreed to an employment
contract that limited its right to terminate D'Unger at will is "so weak as to do no more than create a mere surmise or
suspicion of its existence." Kindred, 650 S.W.2d at 63. Absent an express agreement to the contrary, employment
relationships in Texas are presumed at-will. Brown, 965 S.W.2d at 502. 

 Having found that the evidence is legally insufficient to support the finding, we sustain the Foundation's first issue.

III. Attorney's Fees

 In the second issue, it is argued that D'Unger is not entitled to attorney's fees if his contract claim fails. We agree. An
award of attorney's fees must be based upon some statutory or contractual authority. Tex. Civ. Prac. & Rem. Code Ann. §
38.001 (Vernon 1997); Holland v. Wal-Mart Stores, Inc., 1 S.W.3d 91, 95 (Tex. 1999); see Dallas Cent. Appraisal Dist. v.
Seven Inv. Co., 835 S.W.2d 75, 77 (Tex. 1992) (citingNew Amsterdam Cas. Co. v. Tex. Indus. Inc. 414 S.W.2d 914, 914-16
(Tex. 1967)) (attorney's fees may not be recovered unless provided for by statute or by contract between parties). To
recover attorney's fees under section 38.001 of the civil practice and remedies code, a party must both prevail on a claim for
which attorney's fees are recoverable and recover damages. Green Int'l v. Solis, 951 S.W.2d 384, 390 (Tex. 1997); see Tex.
Civ. Prac. & Rem. Code Ann. § 38.001 (Vernon 1997) (reasonable attorney's fees recoverable if claim is for, inter alia, an
oral or written contract). D'Unger's claim for attorney's fees against the Foundation is based on his breach-of-contract claim. 
However, he failed to recover damages on that claim, and, thus, is not entitled to recover attorney's fees that basis. See
Green Int'l, 951 S.W.2d at 390. 

 Furthermore, "attorney's fees are not recoverable either in an action in tort or a suit upon a contract unless expressly
provided by statute or by contract between the parties." Knebel v. Capital Nat'l Bank in Austin, 518 S.W.2d 795, 803-04
(Tex. 1974) (emphasis added); see Martin-Simon v. Womack, 68 S.W.3d 793, 797 & n.2 (Tex. App.-Houston [14th Dist.]
2001, pet. denied) (discussing circumstances where sister courts of appeals have adopted equitable exception to general rule
of non-recovery of attorney's fees in tort cases but Houston Court declining to do so). Neither the Texas Supreme Court nor
this Court has adopted any wrongful-act exception to the general prohibition against recovery of attorney's fees in a tort
claim, and we decline to do so in this case. Martin-Simon, 68 S.W.3d at 797. We find no statutory or contract basis for
recovery of attorney's fees under the tortious interference claim D'Unger brought against Altheide or under the wrongful
termination claim brought against the Foundation. Therefore, D'Unger is not entitled to recover attorney's fees on his
remaining claims.

 Thus, we sustain the second issue.IV. Wrongful Termination Claim

 In its fifth issue, the Foundation asserts that the evidence is not legally sufficient or, alternatively, factually sufficient to
support the jury's finding that the Foundation discharged D'Unger's employment because he refused to perform an illegal
act. (3)

A. Standard of Review

 As set out above, because the Foundation is attacking the legal sufficiency of a finding on which D'Unger bore the burden
of proof, it must demonstrate, on appeal, that the record presents no evidence to support the adverse finding. See Croucher,
660 S.W.2d at 58. Further, only the evidence and inferences that support the finding will be considered. See Lenz, 79
S.W.3d at 19; Maxus, 766 S.W.2d at 276. Additionally, as set out above, in the appeal of its factual sufficiency challenge,
because the Foundation did not bear the burden of proof on this issue at trial, the Foundation must demonstrate that the
record presents insufficient evidence to support the finding that D'Unger's discharge was for refusing to perform an illegal
act. Gooch, 902 S.W.2d at 184.

B. Analysis

1. Refusal to Perform an Illegal Act

 Discharge of an at-will employee for refusing to perform an illegal act is one of the exceptions to the doctrine that an
employer may terminate an at-will employee for a good reason, a bad reason, or no reason at all. Brown, 965 S.W.2d at
502; see Sabine Pilot Serv., Inc. v. Hauck, 687 S.W.2d 733, 735 (Tex. 1985). D'Unger bore the burden of proving that his
discharge was for no reason other than an unwillingness to perform an illegal act. See Sabine Pilot, 687 S.W.2d at 735.

 D'Unger relies, in part, on the following evidence to establish that Altheide instructed him to perform an illegal act: (1)
Altheide's June 30, 1997 letter addressed to the Foundation directors, including D'Unger; (2) an April 13, 1998
memorandum suspending D'Unger; and (3) D'Unger's discussion with Altheide about firing Ed DuBose, a foreman at the
Ranch. Altheide's June 30, 1997 letter to Board members informed them that an unidentified board member was
conducting an independent investigation into the appropriateness of equipment acquisitions and some of the activities at the
Ranch. Altheide explained that an independent investigation by an individual board member was totally inappropriate and
that such concerns should have been addressed to him or to the entire board. The April 13, 1998 memorandum suspended
D'Unger because of "[his] disregard for appropriate instruction and normal business procedure." The first paragraph of the
April 13 memorandum specifically referred to a call Altheide received from the Mexican Consulate office in Corpus
Christi. According to Altheide, the representative from the Consulate's office informed him that D'Unger was concerned
about "incidents that took place on the Galvan [Ranch] where Mexican citizens were detained." In that same memorandum
Altheide indicated surprise that D'Unger took action without first bringing the matter to the Board's attention as previously
instructed, giving the Board an opportunity to act. Altheide reminded D'Unger that he had been cautioned about
independent activities in the past and about using proper channels.

 D'Unger also testified he first met DuBose at the Ranch where D'Unger was discussing research proposals with Lee Elliot
from the Texas Parks and Wildlife Department. Introductions were made and then, "just bolt out of the blue," DuBose said,
"Well, we chased [undocumented immigrants] with dogs today . . . and ran them through the fence and made them lose
their food and water." D'Unger testified this caused him tremendous concern. He told DuBose he could not be doing that,
he should not be doing that, and to stop. That same day D'Unger advised the border patrol to "keep your eye[s] open for
anybody with torn up clothes or dog bites." Altheide accused D'Unger of lying to the border patrol and insisted the event
"didn't happen." However, beginning in January 1997, other visitors to the Ranch reported to D'Unger that DuBose had
made statements to them that he chased undocumented immigrants with dogs and fired gunshots over their heads so they
would abandon their food and water when they had to run and climb through the Ranch's fence line. The record reveals
Altheide noted in his diary that on July 10, 1997, DuBose had "discharged his pistol in the air when two trespassers would
not move away from the cattle guard area when he hollered at them."

 D'Unger also testified that in September 1997, he saw a ranch report regarding the apprehension of three Mexican
nationals on the Ranch, young men who had been handcuffed on the Ranch. He took the negatives of photographs taken of
the men in order to have the photographs reproduced. D'Unger had information that the three men had been turned over to
the border patrol; however, the border patrol agents he contacted had no knowledge of the incident. He was concerned
about the well-being of the three young men. D'Unger could not confirm what had happened to the Mexican Nationals
after DuBose handcuffed them on the Ranch. The border patrol did not know the status of the young men. DuBose
informed D'Unger he had used dogs to chase other undocumented immigrants through a fence so that they would lose their
food and water. It appeared to D'Unger as if the transients had disappeared from the Ranch. He believed DuBose had lied
about the fate of the boys. It could be inferred that transients were being harmed by the actions of those on the Ranch.

 D'Unger testified he continued to express his alarm that mistreatment of transient non-United States citizens, in violation
of both the law and the Foundation's mission, was occurring on the Ranch. Rather than reporting his concerns to the
Foundation or Altheide as requested, D'Unger contacted, among others, a congressman, a senator, a judge, sheriffs, the
Attorney General's office, the Internal Revenue Service, and the Mexican Consulate.

 Additionally, D'Unger testified that before DuBose's contract was up, he had a discussion with Altheide about firing
DuBose. It was at that time that Altheide told him "to drop it, some[thing] to that effect, drop it or leave it alone." It was
D'Unger's impression that he was not to concern himself with DuBose. D'Unger also testified that he understood Altheide
to mean he was to turn a blind eye to DuBose's mistreatment of transients on the Ranch and generally not disclose to
anyone any information about illegal activity involving the Foundation and, more specifically, that he was not to report to
law enforcement any criminal conduct by DuBose.

 DuBose also provided testimony regarding the September 17, 1997 occurrence. He testified that, with the assistance of a
ranch hand, he handcuffed three Hispanic teenagers who trespassed on the Ranch. The men were handcuffed together and
frisked. DuBose took photographs of the men and called the border patrol. Approximately three hours later a border patrol
agent arrived and took the men into custody. A ranch report for September 17 and telephone records presented to the jury
support this testimony. However, this information was not confirmed by the border patrol until after D'Unger's
involvement with the Foundation had ended. From January 1998 through August 1998, the border patrol agent reported
only that it had no record of Mexican Nationals apprehended at the Ranch on September 17, 1997. The agent informed
D'Unger on several occasions that the Immigration and Naturalization Service could not locate any paperwork on the
incident. This same agent also informed the jury he had not heard of any shooting incidents at the Ranch, and did not have
any knowledge of the discovery of any bodies on the Ranch.

 Attorney John White, a member of the board of directors for the Foundation, testified there was an investigation by the
Board regarding the issues raised by D'Unger. According to White, the results of the investigation were positive except for
complaints about DuBose's inappropriate comments. Other than these comments, people were delighted with DuBose's
"courtesies." DuBose testified he might have made statements attributed to him but denied engaging in the described
conduct. DuBose also testified he treated transients humanely.

 A call from the Mexican Consulate office regarding "incidents that took place on the Galvan [Ranch] where Mexican
citizens were detained," appeared to trigger D'Unger's suspension. Altheide told Board members that an investigation by an
individual board member was totally inappropriate and should have been addressed to him or to the entire board. Altheide
told D'Unger to leave such matters alone. D'Unger's unwillingness to do so consisted of his refusal to condone DuBose's
activities on the Ranch. D'Unger's effort to contact others outside the Foundation was simply a continuation of this refusal. 
The June 1997 letter and the April 1998 suspension memorandum, as well as conversations between Altheide and D'Unger,
if not expressly stated, provided inferences that talking with others about transient activities on the Ranch was
inappropriate, that D'Unger was to agree with the actions taken by DuBose regarding the transients, and that the matter was
closed. It could be inferred from the evidence that D'Unger was asked to conspire in those activities. (4) 

 Accordingly, considering only the evidence and inferences that support the finding and disregarding all evidence and
inferences to the contrary, Lenz, 79 S.W.3d at 19; Maxus, 766 S.W.2d at 276, we conclude the evidence is legally
sufficient; there is more than a scintilla of evidence to support the jury's finding that D'Unger was discharged from
employment with the Foundation because he refused to perform an illegal act. See Croucher, 660 S.W.2d at 58; Sabine
Pilot, 687 S.W.2d at 735. 

 Furthermore, after examining all of the evidence, Mar. Overseas, 971 S.W.2d at 406-07, the jury could have believed
D'Unger's testimony regarding DuBose's treatment of transients on the Ranch, rather than the testimony of the other
witnesses, including DuBose, Altheide and White. Even though it was later established that the three Mexican Nationals
had been detained by the border patrol and returned to Mexico, the jury could have concluded D'Unger was unwilling to
perform an illegal act. The jury could have decided Altheide's efforts were an attempt to include D'Unger in a conspiracy to
cover up criminal and illegal conduct involving any Mexican National on the Ranch. Moreover, the judge could have
determined a criminal conspiracy was involved. See Sabine Pilot, 687 S.W.2d at 736 (Kilgarlin, J., concurring) (trial judge
must determine if statute with criminal penalty involved). Thus, after a review of the entire record, we conclude the
evidence is also factually sufficient, to prove the Foundation terminated D'Unger for being unwilling to perform an illegal
act. See Ritchey, 734 S.W.2d at 86-87 n.1. 

2. Sole Reason for Termination

 An employer who discharges an employee both for refusing to perform an illegal act and for a legitimate reason cannot be
liable for wrongful termination. Tex. Dep't of Human Servs. v. Hinds, 904 S.W.2d 629, 633 (Tex. 1995). Therefore, in
order to prevail under this Sabine Pilot exception, D'Unger was required to prove not only that he refused to perform an
illegal act, but also that his refusal was the only reason for which he was terminated. See Sabine Pilot, 687 S.W.2d at 735.

 Altheide testified that D'Unger, as an operating officer, was under his direct supervision; D'Unger was to report to him and
was supervised by him. Altheide acknowledged D'Unger did a good job in developing research projects for which grants
were issued in 1996. Altheide testified D'Unger started, but did not finish, the construction work, failed to keep time
records, and failed to complete a plan for the exempt purpose use of the Foundation's property. Altheide explained
D'Unger completed a preliminary draft, a concept paper describing different activities in very vague or very general terms. 
Altheide testified D'Unger did not develop an administrative, overall strategy plan on how the Foundation would conduct
the activities outlined by D'Unger. Altheide also testified D'Unger did not fulfill his duties of negotiating and monitoring
leases of the surface estates including cattle and hunting leases, and he only partially fulfilled his responsibility to assist
Altheide with mineral lease activities.

 At trial, Altheide compiled a list outlining why D'Unger was not a good employee. The list included the following
reasons: (1) D'Unger resisted any supervision or oversight; (2) D'Unger lacked focus; (3) D'Unger demonstrated erratic
behavior and had an explosive personality; (4) D'Unger did not perform his job duties; (5) D'Unger was not capable of
supervising others or assuming additional responsibilities; and (6) D'Unger lacked loyalty to the Foundation.

 Referring to the above list, Altheide testified D'Unger would explode or ignore instructions or suggestions given by
individual board members, specifically Altheide, and would respond that he answered to the Board. D'Unger focused on
individual events and daily activities, not on the whole program; it was a disjointed effort. Altheide further testified
D'Unger's behavior was erratic, inconsistent from day to day. D'Unger would blow up in public and make remarks that were
totally inappropriate. Altheide explained D'Unger could not perform his job duties and was not capable of supervising
others. Any project D'Unger started would unravel, and D'Unger could not finish it. In Altheide's opinion, D'Unger was
not capable of assuming the duties of the president or to act in his absence. Finally, Altheide testified D'Unger lacked
loyalty to the Foundation and was not concerned about its perpetual existence.

 In the letter of suspension, Altheide admonished D'Unger for taking action regarding his concerns about an incident on the
Ranch where Mexican citizens were detained, without first bringing it to the Board's attention and giving the Board an
opportunity to act. D'Unger testified his employment with the Foundation was suspended and later terminated because he
went to the authorities regarding this incident, disregarding instruction and normal business procedure. D'Unger testified
that it was for that reason and no other, including the reasons Altheide identified at trial.

 D'Unger also testified he performed his job duties including supervising exempt purpose activity. He prepared a
"Proposed Exempt Purpose Activities (Plan)." D'Unger testified the background section of the Plan was used to set out the
purpose of the Foundation and the general guideline for instructions that followed. The methods for achieving the goals of
the Foundation were included in the methodology section. As an operating foundation, the Foundation was required to use
its assets. The primary assets of the Foundation were the two ranches. The Plan set out how the ranches could be used
through the areas of biology (range and wildlife management) and geology (identification, evaluation and use of waters and
minerals), academic research, public service research, joint venture research, contract for services, and commercial
research. Other than research, the Ranch facilities could be opened to various youth groups. The Plan's public sector and
social support section included concerns about the number of Mexican Nationals and narcotics smuggling going through
both ranches. D'Unger testified that "[w]e felt like it was consistent with our mission to support efforts to support the laws." 
The Plan also proposed exempt purpose guidelines that sought to encourage additional support for its goals, encourage
research, and encourage appropriate social policies and social activities on the Ranch. Attached to the Plan was a flowchart
showing the interrelationships between the ideas and the entities with which the Foundation dealt. Also attached was a list
of persons D'Unger had contacted in an effort to "get a feel for what the needs were in the various areas." D'Unger testified
he spent months preparing this draft Plan. Altheide requested the report. It was presented to everybody. D'Unger did not
know if Altheide approved it. Altheide did not return it to D'Unger with comments. D'Unger testified that this draft Plan
appeared to be the backbone of the "Ed Rachal Foundation Operational Overview 19[9]8 (Overview)." Only Altheide's
name, as CEO, appeared on the Overview. D'Unger testified he implemented plans, and reported to the Board for approval
of the plans.

 D'Unger further testified he participated in requested planning and oversight of the Taylor construction project by getting
the microwave tower at no cost to the Foundation. He was never given an opportunity to act jointly with Altheide in
disbursing funds, another part of his job description.

 In response to other reasons given by Altheide that would support his termination, D'Unger testified he only resisted
supervision or oversight where conduct was inappropriate. D'Unger "felt like [he] was focused," and did not believe he
acted erratically. D'Unger testified he does not have an explosive personality. Again, he testified that he performed his job
well. D'Unger had no opportunity to supervise others and was not given an opportunity to assume additional
responsibilities. His loyalty was to the Foundation, not to Altheide. Finally, D'Unger testified he did keep time records in
accordance with record forms provided and did put in more than forty hours a week, usually exceeding six to seven days a
week; working as much as was necessary.

 Considering only the evidence and inferences supporting the finding, D'Unger's testimony was that he performed his job
duties and remained focused. He provided a plan for exempt purpose activities, a plan that was used to create the overview
of the Foundation. D'Unger satisfactorily handled the microwave tower construction project. Altheide acknowledged that
D'Unger did a good job in developing research projects. He was not given opportunities to take on other responsibilities.
Furthermore, as set out above, we have found there is evidence that D'Unger was unwilling to perform an illegal act. 
Accordingly, this Court concludes the record presents more than a scintilla of evidence to support the adverse finding that
D'Unger's unwillingness to perform an illegal act was the sole reason for his termination. Further, after a review of the
entire record, we conclude the evidence is factually sufficient to prove the Foundation terminated D'Unger for the sole
reason he was unwilling to perform an illegal act. The jury could have believed D'Unger's testimony, rather than that
offered by Altheide. Further, the jury could have believed evidence, if any, that D'Unger was an impediment to Altheide's
exercise of control, that he was disruptive or insubordinate, and that he disclosed information to third parties, was evidence
of D'Unger's continued refusal to perform an illegal act, the sole reason for his termination.

 We, therefore, hold the evidence is legally and factually sufficient to support the jury's finding as to the wrongful
termination claim. The Foundation's fifth issue is overruled.

V. Charge Error

 In its sixth issue, the Foundation challenges subsection (3) of the instruction to Question No. 5 of the jury charge. It
provides:

 An employee is wrongfully discharged if the sole reason for his discharge was:



* * *



 


 the employee, having knowledge of two or more persons conspiring to injure, oppress, threaten, or intimidate any
person in the free exercise or enjoyment of life or property, refuses to conceal and not to make known such matter as
soon as possible to some federal authority. . . .




 A trial court must submit in its charge to the jury all questions, instructions, and definitions raised by the pleadings and
evidence that will aid the jury in reaching a verdict. Tex. R. Civ. P. 278; Hyundai Motor Co. v. Rodriguez, 995 S.W.2d
661, 663-64 (Tex. 1999). The trial judge is accorded broad discretion so long as the charge is legally correct. Rodriguez,
995 S.W.3d at 664. Upon the general principle that a proper jury instruction is one that assists the jury and is legally
correct, a trial court may personalize or individualize a charge to the facts of the case so the jury can understand the law
more easily. United States Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc., 865 S.W.2d 214, 220 (Tex.
App.-Waco 1993, writ denied). Trial courts also are given considerably more discretion in submitting instructions and
definitions than in submitting questions. Harris v. Harris, 765 S.W.2d 798, 801 (Tex. App.-Houston [14th Dist.] 1989,
writ denied); Houston Nat'l Bank v. Biber, 613 S.W.2d 771, 776 (Tex. Civ. App.-Houston [14th Dist.] 1981, writ ref'd
n.r.e.); see also Ishin Speed Sport, Inc. v. Rutherford, 933 S.W.2d 343, 349-50 (Tex. App.-Fort Worth 1996, no writ). An
explanatory instruction is improper only if it is a misstatement of the law as applicable to the facts. See DeLeon v. Pickens,
933 S.W.2d 286, 292 (Tex. App.-Corpus Christi 1996, writ denied).

 Specifically, the Foundation contends that subsection (3) is an incorrect statement of the law, and, thus, is immaterial. See
Salinas v. Rafati, 948 S.W.2d 286, 288 (Tex. 1997); Spencer v. Eagle Star Ins. Co., 876 S.W.2d 154, 157 (Tex. 1994). The
Foundation argues that subsection (3) transforms the wrongful discharge question into a whistle blower question.

 This argument, however, mischaracterizes the trial court's actions. "The Texas Whistleblower Act provides that certain
public employees discriminated against for reporting a violation of the law in good faith to an appropriate law enforcement
authority may sue for damages and other relief." Hinds, 904 S.W.2d at 631 (citing Tex. Gov't Code Ann. §§ 554.001-.009
(Vernon 1994 & Supp. 2003)). Subsection (3) does not instruct the jury that an employee is wrongfully discharged if the
sole reason for his discharge was for reporting a violation of the law in good faith to an appropriate law enforcement
authority. Rather, subsection (3) instructs the jury that an employee is wrongfully discharged if the sole reason for his
discharge was the employee, having knowledge of two or more persons conspiring to injure, oppress, threaten, or intimidate
any person in the free exercise or enjoyment of life or property, refuses to conceal and not to make known such matter as
soon as possible to some federal authority. The trial court submitted this instruction based on applicable federal law of
misprision, a statute identified by D'Unger in his petition. See 18 U.S.C. § 4.

 Article 18, section 4 of the Constitution of the United States provides:

 Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and
does not as soon as possible make known the same to some . . . other person in civil . . . authority under the United States,
shall be fined under this title or imprisoned not more than three years, or both.



Id. We cannot conclude, therefore, that this is an incorrect statement of law as the Foundation argues. Moreover, because
trial courts are given considerably more discretion in submitting instructions and definitions than in submitting questions,
we conclude the trial court did not abuse its discretion in including this subsection in the instruction. See Harris, 765
S.W.2d at 801; Houston Nat'l Bank, 613 S.W.2d at 776. The Foundation's sixth issue is overruled.

 The Foundation asserts in its seventh issue that section (4) of the instruction to Question No. 5 was also included in error. 
That section provides:



 An employee is wrongfully discharged if the sole reason for his discharge was:



* * *



 (4) the employee resists intentional harassment of his employer to hinder, delay, prevent or dissuade the employee's
reporting to a law enforcement officer of the United States the commission or possible commission of a federal offense.



The Foundation's sole contention is that this instruction sought to describe the violation of a statute that D'Unger had not
specifically pled; thus, it was error to include it in the charge. We conclude, however, that the pleadings were sufficient to
support its submission. See Tex. R. Civ. P. 47(a) (pleading shall contain short statement of cause of action, sufficient to
give fair notice of claim), 45(b) (pleading shall consist of statement in plain and concise language of plaintiff's cause of
action).

 D'Unger's petition set out the following:

VI.

 Plaintiff's discharge was for the sole reason that D'Unger refused to perform an illegal act, and/or made a good faith
attempt to determine whether the acts the Foundation requested him to perform, ratify and/or approve were illegal.



VII.



 It is herein further alleged that Altheide and others were engaged in a conspiracy in which D'Unger refused to participate. 
Due to the fact that D'Unger would not participate in a cover up, D'Unger was in effect ordered to make either false
statements or conceal information from a department or agency of the United States of America and/or the State of Texas. 
Because D'Unger refused to be a part of the conspiracy, cover up, and/or obstruction of justice, D'Unger was "squeezed
out" of the Foundation. D'Unger's refusal to cooperate and participate in such illegal and unlawful activities creates an
action based on the theory of wrongful termination.



Accordingly, we conclude the court did not abuse its discretion when it included this instruction in the charge. See Boyles
v. Kerr, 855 S.W.2d 593, 601 (Tex. 1993) ("A court should uphold the petition as to a cause of action that may be
reasonably inferred from what is specifically stated, even if an element of the cause of action is not specifically alleged.");
see also Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 897 (Tex. 2000) (petition is sufficient if it gives fair and
adequate notice of facts upon which pleader bases claim). The Foundation's seventh issue is overruled.

VI. Tortious Interference Claim

 In issue three, Altheide asserts the evidence is not legally sufficient or, alternatively, factually sufficient, to support the
finding that he tortiously interfered with D'Unger's contractual agreement with the Foundation. (5) The elements of a cause
of action for tortious interference with a contract are: (1) the existence of a contract subject to interference; (2) the
occurrence of an act of interference that was willful and intentional; (3) the act was a proximate cause of the plaintiff's
damage; and (4) actual damage or loss occurred. Holloway v. Skinner, 898 S.W.2d 793, 795-96 (Tex. 1994). The second
element is particularly important when the defendant serves the dual roles of corporate agent and the third party who
allegedly induces the corporation's breach. Id. at 796. In that event, to preserve the logically necessary rule that a party
cannot tortiously interfere with its own contract, the plaintiff must prove that the corporate agent's alleged interference was
in furtherance of the agent's personal interests, not the corporation's. Id.

 The plaintiff meets this burden by showing that the agent acted in a fashion so contrary to the corporation's best interests
that only the agent's personal interests could have motivated the actions. Id. The mere existence of a personal stake in the
outcome cannot alone constitute proof the corporate agent committed an act of willful or intentional interference. Id. In
other words, the plaintiff must show that the agent acted solely in furtherance of the agent's own interests. Id.; Powell
Indus., Inc. v. Allen, 985 S.W.2d 455, 457 (Tex. 1998) (per curiam). Once the plaintiff meets its burden, liability for
tortious interference with a contract is established unless the corporate agent proves the affirmative defense of legal
justification. Holloway, 898 S.W.2d at 796; see Kingston v. Helm, 82 S.W.3d 755, 763 n.3 (Tex. App.-Corpus Christi
2002, pet. denied). 

 In addition, when a party acts through an agent, the act of an agent for a principal may not subject the agent to liability for
tortious interference with a contract so long as the agent acts in good faith and believes that the action is for the best interest
of the principal. Holloway, 898 S.W.2d at 794-95. We must consider the principal's evaluation of the agent's action when
determining whether an agent acted against the principal's interests. Powell Indus., 985 S.W.2d at 457. A principal is a
better judge of its own best interests than a jury or court. Id. If a principal does not complain about its agent's actions, the
agent cannot be held to have acted contrary to the principal's interests. Id. "[E]ven such a corporate complaint is not
conclusive evidence that the agent was acting for his or her personal interests." Latch v. Gratty, Inc., 107 S.W.3d 543, 546
(Tex. 2003).

 The jury found that Altheide intentionally interfered with D'Unger's contractual agreement with the Foundation without a
good-faith belief that he had a right to do so. We have held that the evidence is legally and factually insufficient to support
the finding of an employment contract between D'Unger and the Foundation that modified D'Unger's at-will employment
status. However, an at-will employment agreement, such as the one in this case, can be the subject of a claim of tortious
interference. Sterner v. Marathon Oil, 767 S.W.2d 686, 688 (Tex. 1990). 

 As we review legal sufficiency, again we consider only the evidence and inferences that support the finding, and disregard
all evidence and inferences to the contrary. Lenz, 79 S.W.3d at 19; Maxus, 766 S.W.2d at 276. Altheide did not bear the
burden of proof at trial on the tortious-interference claim. Holloway, 898 S.W.2d at 795-96; Kingston, 82 S.W.3d
at 763 n.3. Therefore, we analyze Altheide's legal-sufficiency challenge in his third issue as a no-evidence issue. Gooch,
902 S.W.2d at 183. Altheide must show that the record presents no evidence to support the adverse finding. Croucher,
660 S.W.2d at 58. Specifically, Altheide must show that the record presents no probative evidence to support the essential
fact that his alleged interference was in furtherance of his own personal interests, not the Foundation's. Holloway,
898 S.W.2d at 795.

 D'Unger argues that the evidence, including Turner's testimony, supports the conclusion that his termination was not in the
Foundation's best interest and thus was prohibited by the Foundation's by-laws. D'Unger's testimony and the opinion of his
expert was that Altheide acted in his own best interests, not the Foundation's, when he fired D'Unger. D'Unger's statement
of subjective belief of Altheide's motives, however, is not evidence. See Cont'l Coffee Prods., 937 S.W.2d at 452; see also
In re Jones, 974 S.W.2d at 769. Nor are his expert's speculations evidence. SeePitzner, 106 S.W.23d at 729; see also
Wadewitz, 951 S.W.2d at 467. 

 D'Unger also refers us to evidence of the benefit Altheide derived from Altheide's personal use of the Ranch and $6,000
salary increase to cover the value of that usage to the Foundation. Considering only the inference suggested by
D'Unger,that by firing D'Unger Altheide secured a benefit for himself with regard to continued use of the Ranch and
increased salary, D'Unger had to prove more than the fact that Altheide benefitted personally from firing D'Unger. 
Holloway, 898 S.W.2d at 798. He had to prove that Altheide acted willfully or intentionally to serve Altheide's personal
interests at the expense of the Foundation. Id.

 D'Unger further asserts that the evidence shows that the Board did not ratify his termination as required by the
Foundation's by-laws. However, it is undisputed that D'Unger did not seek election to a new term as director of the
Foundation. It is also undisputed that the Board unanimously elected new directors and officers, a slate that did not include
D'Unger. Therefore, we find as a matter of law that the Board effectively ratified D'Unger's termination by not re-electing
D'Unger but rather by electing other officers. The Foundation is the best judge of its own interests. See Powell Indus., 985
S.W.2d at 457.

 The evidence is undisputed that the Foundation did not complain about Altheide's termination of D'Unger. We cannot find
that Altheide acted contrary to the Foundation's interests. See id. D'Unger failed to introduce probative evidence tending to
prove that firing D'Unger was so contrary to the Foundation's best interests that it could only have been motivated by
Altheide's pursuit of his own personal interests. See Holloway, 898 S.W.2d at 798. No more than a scintilla of evidence
exists "that would enable reasonable and fair-minded people to differ in their conclusions" about whether Altheide
furthered his own personal interests at the expense of the Foundation's in firing D'Unger. See Moriel, 879 S.W.2d at 25. 
Accordingly, we find that D'Unger did not meet his burden of proving each element of tortious interference. See Holloway,
898 S.W.2d at 795. Because D'Unger did not establish liability for tortious interference with a contract, we need not
address Altheide's affirmative defense of legal justification. See id. We hold that the evidence is legally insufficient to
support the finding that Altheide tortiously interfered with D'Unger's at-will employment agreement with the Foundation. 
See id.

 Having found that the evidence is legally insufficient to support the finding, we sustain Altheide's third issue. (6)

VII. Evidentiary Issues

A. Motivation Testimony

 In its ninth issue, the Foundation contends the trial court erred in allowing Turner to testify as to the Foundation's motive
for terminating D'Unger's employment because his testimony is speculative and unreliable. (7) To support its claim of error,
the Foundation relies on an objection it made to Turner's testimony wherein he provided his opinion as to why Altheide
terminated D'Unger. This objection was overruled. After examining the record in this case, however, we conclude
appellant has waived the issue it brings on appeal.

 A party should object every time inadmissible evidence is offered. See Duperier v. Texas State Bank, 28 S.W.3d 740, 755
(Tex. App.-Corpus Christi 2000, pet. dism'd by agr.). The Foundation failed to object to Turner's subsequent testimony
regarding the sole reason that the Foundation terminated D'Unger. The Foundation did not ask the trial court for a running
objection on motivation testimony. Thus, it has waived its objection to the testimony about which it complains on appeal.
See id.

 Moreover, to obtain reversal of a judgment based on error in the admission or exclusion of evidence, an appellant must
show that the trial court's ruling was in error and that the error was calculated to cause and probably did cause "the
rendition of an improper judgment." Tex. R. App. P. 44.1; Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43
(Tex. 1998). Therefore, even if we were to conclude the trial court erred in admitting the complained of testimony, the
Foundation has not shown that the error was calculated to cause and probably did cause "the rendition of an improper
judgment." Tex. R. App. P. 44.1; Owens-Corning Fiberglas Corp., 972 S.W.2d at 43. The Foundation's ninth issue is
overruled.B. Admission of Exhibits By the eleventh issue, appellants contend the trial court erred in admitting exhibits 34
and 54, (8) evidence requested by the appellants but withheld by D'Unger. Each exhibit is a faxed correspondence from the
Foundation's attorney, Carol Bailey, to Altheide. (9)

 Unless the trial court finds good cause, the failure to supplement discovery results in the loss of opportunity to present
evidence. Morrow v. HEB, Inc., 714 S.W.2d 297, 297-98 (Tex. 1986). The trial court's determination of whether a party
had good cause for failure to supplement discovery will not be set aside, however, unless there is an abuse of discretion. Id.
at 298. Moreover, as set out above, to obtain reversal of a judgment based on error in the admission of evidence, an
appellant must show that the trial court's ruling was in error and that the error was calculated to cause and probably did
cause "the rendition of an improper judgment." Tex. R. App. P. 44.1; Owens-Corning Fiberglas Corp., 972 S.W.2d at 43.

 Therefore, even if the trial court erred in admitting the exhibits, the Foundation has not shown that the error was calculated
to cause and probably did cause "the rendition of an improper judgment." Tex. R. App. P. 44.1; Owens-Corning Fiberglas
Corp., 972 S.W.2d at 43. Thus, we overrule the Foundation's eleventh point.

VIII. Trial Subpoena of DuBose, a Non-Party Witness

 Appellants, by their tenth issue, contend the trial court erred in issuing the subpoena of DuBose. They argue that the
court erred because DuBose was not a party to the suit and because he was beyond the range of proper service under Texas
Rules of Civil Procedure 176.3(a) and 176.5(a). Tex. R. Civ. P. 176.3(a), 176.5(a). Appellants also urge error on the basis
that the subpoena was improperly served on their counsel.

 We examine a trial court's decision to quash a subpoena to determine if the court abused its discretion. Shannon v. Devine,
917 S.W.2d 465, 467 (Tex. App.--Houston [1st Dist.] 1996, orig. proceeding). As above, however, we need not address
whether the court abused its discretion, because, even assuming error, appellants have not shown what harm resulted from
the issuance of the subpoena. Tex. R. App. P. 44.1. DuBose was called as D'Unger's first witness. (10) Appellants were
given the opportunity to cross-examine DuBose. Furthermore, DuBose has not made any appearance in this appeal, and did
not, himself, challenge the court's ruling on appellants' motion to quash. Appellants' tenth issue is overruled.

IX. Damages

 In its twelfth issue, the Foundation contends that the trial court erred in allowing the recovery of damages past September
1, 1998, the term of the alleged contract. Although the contract claim failed, D'Unger has prevailed on the wrongful
termination claim against the Foundation. Therefore, we review this argument as it applies to wrongful termination.

 Generally, when the terms of employment are indefinite, the loss of wages an employee would have earned in the
indefinite future is not a recoverable item of damages. Town of S. Padre Island v. Jacobs, 736 S.W.2d 134, 137 (Tex.
App.-Corpus Christi 1986, writ denied). However, as set out above, under Sabine Pilot, an employee may recover damages
for the employer's wrongful termination if the employee proves he was discharged solely for refusing a request to perform
an illegal act that would subject the employee to criminal penalties. See Sabine Pilot, 687 S.W.2d at 735. Although the
majority in Sabine Pilot did not address damage issues, Justice William W. Kilgarlin, in his concurrence, writes that
damages under the Sabine Pilot narrow exception should parallel those available in a worker's compensation case where an
employee has been wrongfully discharged. Id. at 736 (concurrence, Kilgarlin, J.).

 Logically, [Texas Labor Code section 451.001] (prohibition for filing a worker's compensation claim) should serve as a
guide [in determining plaintiff's measure of damages when the Sabine Pilot's narrow exception applies]. If so, damages
would include loss of wages, both past and those reasonably anticipated in the future, and employee and retirement benefits
that would have accrued had employment continued. It would also include punitive damages.



Id. (citing Carnation Co. v. Borner, 610 S.W.2d 450, 454 (Tex. 1980) (future lost wages awarded in wrongful discharge
worker's compensation case)); see Borden, Inc. v. Guerra, 860 S.W.2d 515, 524 (Tex. App.-Corpus Christi 1993, writ
dism'd by agr.) (past and future lost wages for wrongful discharge in worker's compensation case affirmed); see also Tex.
Lab. Code Ann. § 451.002 (Vernon 1996) (person violating section 451.001 liable for reasonable damages incurred by
employee as result of violation). We agree with this reasoning and hold the trial court did not err in allowing recovery of
wages reasonably anticipated past September 1, 1998. The Foundation's twelfth issue is overruled.

 In issue thirteen, the Foundation argues the evidence is legally and factually insufficient to support the jury's finding of the
present value of D'Unger's future lost wages in the amount of $359,332.00. The Foundation specifically complains that
D'Unger's expert, Scott Turner, a certified public accountant, who provided the only evidence of damages, did not include a
calculation of the present value of D'Unger's future lost wages.

 "[T]he jury has the power to consider as proven any matter that is of common knowledge in the community." Mo. Pac.
R.R. Co. v. Kimbrell, 160 Tex. 542, 334 S.W.2d 283, 286 (1960). While the jury must assess damages to accrue in the
future on the basis of the present cash value (the amount if paid now in cash), still no evidence of the earning power of
money must be introduced. Id.; Rendon v. Avance, 67 S.W.3d 303, 310 (Tex. App.-Fort Worth 2001, pet. granted, w.r.m.);
(11) see McIver v. Gloria, 140 Tex. 566, 169 S.W.2d 710, 712 (1943) (amount of plaintiff's loss of earning capacity is always
uncertain and must be left largely to jury's sound judgment and discretion).

 In the present case, the trial court instructed the jury to calculate the awards for lost earnings in terms of a sum of money,
"the present cash value." We must presume that the jury properly followed the trial court's instructions. See Rendon, 67
S.W.3d at 311 (citing Turner, Collie & Braden, Inc. v. Brookhollow, Inc., 642 S.W.2d 160, 167 (Tex. 1982) (appellate
court must assume jury properly followed trial court's instructions)). As set out in Kimbrell, we believe the jury was
qualified to make the calculation of the present value of D'Unger's lost wages based on its common knowledge. See
Kimbrell, 334 S.W.2d at 286. We conclude, therefore, evidence of the earning power of money, either by way of interest
rates or proper discounts, was not required to be introduced. The Foundation's thirteenth issue is overruled.X. Conclusion

 Accordingly, we affirm the judgment of the trial court on D'Unger's wrongful termination claim and the award of damages
against the Foundation. We reverse and render judgment on the breach-of-contract claim in favor of the Foundation. We
also reverse the trial court's award of attorney's fees and render judgment that D'Unger take nothing on his claim for
attorney's fees. Finally, we reverse and render judgment on the tortious interference with a contract claim in favor of
Altheide. 

NELDA V. RODRIGUEZ

 Justice



Concurring and Dissenting Opinion 

by Justice Castillo.



Opinion delivered and filed

this 29th day of August, 2003.

1. D'Unger repeated questions asked of the directors of the Foundation about Altheide's alleged self-dealing with regard to
the Foundation's contracts with the construction company owned by Altheide's friend. D'Unger reported his opinion that
the $6,000 valuation of Altheide's personal use of the Ranch was under market. He pointed out that Altheide was failing to
pay even the undervalued amount set by the Foundation's compensation committee, since Altheide gave himself a salary
increase to cover the expense.

2. D'Unger also communicated the following information unrelated to the handcuffing incident or Altheide's alleged
self-dealing: (1) the Foundation's assistance to one of its employees in avoiding payment of court-ordered child-support
payments; (2) the feasibility of a receivership for the Foundation; (3) accounting and tax matters regarding the Foundation;
and (4) internal Foundation governance issues that centered on D'Unger's perceptions of Altheide's abuses of authority.

3. Question No. 5 in the jury charge read:



 Was CLAUDE D'UNGER discharged from employment with the ED RACHAL FOUNDATION for the sole reason that
he refused to perform an illegal act?



 INSTRUCTION



 An employee is wrongfully discharged if the sole reason for his discharge was:



 (1) the employee sought to find out from proper authority if a requested act was illegal. The requested act need not have
been illegal, but the employee must have had a good faith belief that the requested act might be illegal, and such belief must
have been reasonable; or

 

 (2) the employee refused to participate in a criminal conspiracy. A criminal conspiracy occurs when a person, with intent
that a felony be committed, agrees with one or more persons that they or one or more of them engage in conduct that would
constitute the offense; and he or one or more of them performs an overt act in pursuance of the agreement; or



 (3) the employee, having knowledge of two or more persons conspiring to injure, oppress, threaten, or intimidate any
person in the free exercise or enjoyment of life or property, refuses to conceal and not to make known such matter as soon
as possible to some federal authority; or



 (4) the employee resists intentional harassment of his employer to hinder, delay, prevent or dissuade the employee's
reporting to a law enforcement officer of the United States the commission or possible commission of a federal offense. 



 Answer "Yes" or "No":



 Answer: Yes

4. The elements of a criminal conspiracy are: (1) a person; (2) with intent that a felony be committed; (3) agrees with one or
more persons that they or one or more of them engage in conduct that would constitute the offense; and (4) he or one or
more of them performs an overt act in pursuance of the agreement. Tex. Pen. Code Ann. § 15.02(a) (Vernon 2003).

5. Although Altheide captioned issue three, "The Tortious Interference Claim Fails Because Paul Altheide Had Legal
Justification to Act on Behalf of the Foundation," it is clear from his argument that Altheide is not asking for a review of
his defense of legal justification. He argues that D'Unger failed to establish the elements of the cause of action. We,
therefore, construe his third issue as a challenge to D'Unger's proof of the elements of this cause of action. See Surgitek v.
Abel, 997 S.w.2d 598, 601 (Tex. 1999) (court looks to substance of motion to determine relief sought, not merely title);
State Bar v. Heard, 603 S.W.2d 829, 833 (Tex. 1980) (court looks to substance of plea for relief to determine nature of
pleading, not merely form of title); see also Tex. R. Civ. P. 71 (when plea or pleading mistakenly designated, court shall
treat it as if had been properly designated).

6. Because we have sustained Altheide's third issue, we need not address issue four wherein Altheide contends the trial
court erred in failing to give the Powell instruction because the Foundation's ratification established legal justification as a
matter of law, and issue eight wherein he contends the tortious interference finding is mutually exclusive of the wrongful
discharge finding, and renders the wrongful discharge finding immaterial. See Tex. R. App. P. 47.1. Furthermore, having
sustained issue three, we need not address the portion of issue nine that addresses alleged error in the admission of expert
testimony on motivation for D'Unger's tortious interference claim. See id.

7. We have already discussed and sustained Altheide's tortious interference with a contract issue; therefore, we need not
address Turner's testimony as it relates to that cause of action. See Tex. R. App. P. 47.1.

8. Appellants also complain of the admission of exhibit 31. However, having reviewed the record, we note exhibit 31 was
admitted without objection.

9. Attorney Carol Bailey faxed the following documents to Altheide for his review: (1) exhibit 31, her June 7, 1998 review
of the proposed minutes for the May 19, 1998 meeting; (2) exhibit 34, her August 10, 1998 proposed resolution reducing
the number of voting directors to four; and (3) exhibit 54, her August 11, 1998 rough draft of the minutes of the August 11
special meeting.

10. D'Unger asserts appellants had agreed to produce DuBose at trial, but had not agreed as to when they would produce
him.

11. In Rendon, the supreme court granted the parties' joint motion to grant the petition and to remand the case to the trial
court. See Rendon v. Avance, 67 S.W.3d 303, 310 (Tex. App.-Fort Worth 2001, pet. granted, w.r.m.); see also Tex. R.
App. P. 56.3 (order on petition for review when case settled by agreement of parties). The opinion of the Fort Worth Court
of Appeals was not vacated and has the precedential value of a petition dismissed case. SeeTex. R. App. P. 56.3.


***********************************************************************************************














NUMBER 13-00-335-CV




COURT OF APPEALS




THIRTEENTH DISTRICT OF TEXAS




CORPUS CHRISTI - EDINBURG






THE ED RACHAL FOUNDATION

AND PAUL D. ALTHEIDE, INDIVIDUALLY , Appellants,



v.


 

CLAUDE V. D'UNGER , Appellee.






On appeal from the 148th District Court

 of Nueces County, Texas.







CONCURRING AND DISSENTING OPINION



Before the Court En Banc


Concurring and Dissenting Opinion by Justice Castillo




 In this employment termination case, appellee Claude D'Unger ("D'Unger") filed suit against his former employer, the Ed
Rachal Foundation (the "Foundation"), and the Foundation's chief executive officer, Paul Altheide ("Altheide"), appellants. 
D'Unger alleged: (1) the Foundation agreed to limit its right to terminate him at will when the parties entered into a
renewable one-year employment contract; (2) the Foundation terminated him within one year of the contract's first renewal
for the sole reason that he refused to perform an illegal act; and (3) Altheide tortiously interfered with D'Unger's contractual
agreement with the Foundation. After a jury verdict and judgment in D'Unger's favor, this appeal ensued. 

I. THE ISSUES


 The Foundation and Altheide present thirteen issues for our review. In issues one and five, respectively, the Foundation
challenges the legal and factual sufficiency of the evidence to support the jury's findings of an employment contract and
wrongful termination. In issue two, the Foundation challenges the award of attorney fees to D'Unger on his
breach-of-contract claim. In issue three, Altheide challenges the legal and factual sufficiency of the evidence to support the
jury's finding of tortious interference. 

 This is a close case. It demands dispassionate and rigorous exercise of our legal- and factual-sufficiency review powers. 
In particular, the case highlights the importance of maintaining analytical distinctions between the two standards of review.
I concur in the majority's reversal of the employment-contract and tortious-interference issues on legal-sufficiency grounds. 
I also concur with the majority's disposition of the attorney-fee issue. I dissent from the majority's affirmance on legal- and
factual-sufficiency grounds of the wrongful-termination issue. I write separately to dissent: (1) from the majority's selective
focus on particular facts rather than the record as a whole in finding the evidence legally and factually sufficient to sustain
the wrongful-termination finding; and (2) from the majority's abdication of our duty as the court of last resort in resolving
factual-sufficiency questions by failing to perform any factual-sufficiency analysis in reversing the employment-contract
and tortious-interference issues on legal-sufficiency grounds. I would scrupulously adhere to the legal-sufficiency scope of
review and reverse each issue on legal-sufficiency grounds. As a matter of judicial economy in the event the supreme court
disagrees, I also would analyze and reverse each issue on factual-sufficiency grounds. I would not reach appellants'
evidentiary and jury-charge issues. See Tex. R. App. P. 47.1. 

II. SUFFICIENCY STANDARDS OF REVIEW


 A court of appeals is not a fact finder. Accordingly, we do not assess witnesses' credibility or substitute our judgment for
that of the jury, even if the evidence supports a different result. Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402, 407
(Tex. 1998). Nor do we re-weigh the evidence and set aside a jury verdict because we feel that a different result is more
reasonable. Pool v. Ford Motor Co., 715 S.W.2d 629, 634 (Tex. 1986) (op. on reh'g). 

A. Legal Sufficiency


 We address legal-sufficiency challenges as either "no-evidence" or "matter-of-law" issues. Gooch v. Am. Sling Co., 902
S.W.2d 181, 183-84 (Tex. App.-Fort Worth 1995, no writ). We analyze the issue as a "no-evidence" challenge when the
party complaining on appeal did not bear the burden of proof at trial. Gooch, 902 S.W.2d at 183. In challenging the legal
sufficiency of the evidence to support a finding on which an adverse party bore the burden of proof, the appellant must
show that the record presents no evidence to support the adverse finding. Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex.
1983). 

 When the party complaining on appeal of the legal sufficiency of the evidence to support a finding bore the burden of
proof at trial, we address the issue as a "matter-of-law" challenge. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241
(Tex. 2001). If, in reviewing a "matter-of-law" challenge, we conclude that the record presents no evidence to support the
finding, we then examine the entire record to determine if a contrary proposition is established as a matter of law. Holley v.
Watts, 629 S.W.2d 694, 696 (Tex. 1982); Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co., 766 S.W.2d 264, 276 (Tex.
App.-Amarillo 1988, writ denied). 

 In performing a legal-sufficiency review, we consider only the probative evidence and inferences that support the
challenged finding, disregarding all evidence and inferences to the contrary. Lenz v. Lenz, 79 S.W.3d 10, 19 (Tex. 2002);
Maxus, 766 S.W.2d at 276. (1) We overrule a legal-sufficiency issue if the record reflects any evidence of probative force to
support the finding. ACS Investors, Inc. v. McLaughlin, 943 S.W.2d 426, 430 (Tex. 1997). We sustain a legal-sufficiency
challenge when: (1) the record conclusively establishes the complete absence of evidence of a vital fact; (2) the court is
barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence
offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a
vital fact. Marathon Corp. v. Pitzner, 106 S.W.3d 724, at *7 (Tex. 2003) (per curiam); Merrell Dow Pharms., Inc. v.
Havner, 953 S.W.2d 706, 711 (Tex. 1997); Hines v. Comm'n for Lawyer Discipline, 28 S.W.3d 697, 701 (Tex.
App.-Corpus Christi 2000, no pet.). If there is more than a scintilla of evidence to support the finding, the legal-sufficiency
challenge fails. Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998). 

 The evidence is no more than a scintilla and, in legal effect, is no evidence "[w]hen the evidence offered to prove a vital
fact is so weak as to do no more than create a mere surmise or suspicion of its existence." Kindred v. Con/Chem, Inc.,
650 S.W.2d 61, 63 (Tex. 1983). Suspicion linked to other suspicion produces only more suspicion, not some evidence. 
Pitzner,106 S.W.3d 724, at *7; Browning-Ferris, Inc. v. Reyna, 865 S.W.2d 925, 928 (Tex. 1993). Similarly, an inference
stacked only on other inferences is not legally sufficient evidence. Pitzner,106 S.W.3d 724, at *7. Conversely, more than a
scintilla exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their
conclusions." Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex. 1994). We reverse and render judgment when we
sustain a legal-sufficiency point. Vista Chevrolet, Inc. v. Lewis,709 S.W.2d 176, 177 (Tex. 1986) (per curiam); Heritage
Res., Inc. v. Hill, 104 S.W.3d 612, at *12-*13 (Tex. App.-El Paso 2003, no pet.). 

B. Factual Sufficiency


 Unlike legal-sufficiency challenges, factual-sufficiency issues concede that the record presents conflicting evidence on an
issue. Maxus, 766 S.W.2d at 275. Like legal-sufficiency challenges, the standard of review on factual-sufficiency issues
depends on the burden of proof at trial. Id. at 275. The party attacking a finding on which an adverse party bore the burden
of proof must show that the record presents "insufficient evidence" to support the finding. Gooch, 902 S.W.2d at 184. In
reviewing an insufficient-evidence issue, we examine and consider all of the evidence, not just the evidence that supports
the verdict, to see whether it supports or undermines the finding. Maritime Overseas, 971 S.W.2d at 406-07. We set aside
the finding for factual insufficiency if the "evidence adduced to support the vital fact, even if it is the only evidence
adduced on an issue, is factually too weak alone to support it." See Ritchey v. Crawford, 734 S.W.2d 85, 86-87 n.1 (Tex.
App.-Houston [1st Dist.] 1987, no writ) (quoting Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of
Error, 38 Tex. L. Rev. 361, 366 (1960)). 

 In attacking for factual insufficiency an adverse finding on which it bore the burden of proof at trial, a party must show
that the finding is against the "great weight and preponderance of the evidence." Maxus, 766 S.W.2d at 275; Ritchey,
734 S.W.2d at 86-87 n.1. In that event, we set aside a finding so against the overwhelming weight of the evidence as to be
manifestly unjust and clearly wrong. Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex. 1996) (per curiam). 

 If we reverse a trial court's judgment on factual-sufficiency grounds, we detail all of the evidence relevant to the issue and
articulate why the finding is factually insufficient. Maritime Overseas Corp., 971 S.W.2d at 407. We reverse and remand
for a new trial when we sustain a factual-sufficiency point. Glover v. Tex. Gen. Indem. Co., 619 S.W.2d 400, 401 (Tex.
1981) (per curiam); Heritage Res.,104 S.W.3d 612, at *13. 

III. THE APPLICABLE LAW


A. The Employment-Contract Claim:

The At-Will Employment Doctrine




 In its first issue, the Foundation asserts that the evidence is not legally sufficient or, in the alternative, factually sufficient
to support the jury's finding that the Foundation agreed to an employment contract that limited its right to terminate
D'Unger. In its second issue, the Foundation argues that D'Unger is not entitled to attorney fees if his contract claim fails. 

 All employment relationships in Texas are presumed at will. Montgomery County Hosp. Dist. v. Brown, 965 S.W.2d 501,
502 (Tex. 1998). "[A]bsent a specific agreement to the contrary, employment may be terminated by the employer or
employee, for good cause, bad cause, or no cause at all." Id. Any modification of at-will employment must be based on an
unequivocal statement by the employer not to terminate the employee except under clearly specified circumstances. Byars
v. City of Austin, 910 S.W.2d 520, 523 (Tex. App.-Austin 1995, writ denied). One cannot imply the modification; it must
be express. Midland Judicial Dist. Cmty. Supervision & Corrs. Dep't v. Jones, 92 S.W.3d 486, 487 (Tex. 2002)(per
curiam); Montgomery County Hosp. Dist., 965 S.W.2d at 503-04. The agreement must directly limit, in a "meaningful and
special way," the employer's right to discharge the employee without cause. Larson v. Family Violence & Sexual Assault
Prevention Ctr. of S. Tex.,64 S.W.3d 506, 518 (Tex. App-Corpus Christi 2001, pet. denied). It is the burden of the
discharged employee who asserts that the parties have contractually agreed to limit the employer's right to terminate the
employee to prove an express agreement or written representation to that effect. Id. at 518; Rios v. Tex. Commerce
Bancshares, Inc., 930 S.W.2d 809, 814-15 (Tex. App.-Corpus Christi 1996, writ denied). 

 As with all contracts, the parties to an employment agreement must negotiate and agree to its essential terms for the
agreement to be enforced. See Larson,64 S.W.3d at 519; see also Smith v. SCI Mgmt. Corp., 29 S.W.3d 264, 268 (Tex.
App.-Houston [14th Dist.] 2000, no pet.) ("We find that such a general discussion about an employee's annual
compensation does not raise a fact issue as to whether the parties agreed to limit in a 'meaningful and special way' the
employer's prerogative to discharge the employee without cause."). Similarly, if an essential term of employment is open
for future negotiation, no binding contract is created. Mann v. Trend Exploration Co., 934 S.W.2d 709, 713 (Tex. App.-El
Paso 1996, writ denied). 

B. The Wrongful-Termination Claim:


Exceptions to the At-Will Employment Doctrine


 In its fifth issue, the Foundation asserts that the evidence is not legally sufficient or, alternatively, factually sufficient to
support the jury's finding that the Foundation terminated D'Unger's employment for the sole reason that he refused to
perform an illegal act. Texas law does not provide an exception to the at-will employment doctrine for a private employee
who was discharged for reporting illegal activities in the workplace. Austin v. Healthtrust, Inc., 967 S.W.2d 400, 403
(Tex. 1998); Runge v. Raytheon E-Systems, Inc., 57 S.W.3d 562, 566 (Tex. App.-Waco 2001, no pet.). However, Texas law
does recognize two related exceptions to the doctrine that an employer may terminate an at-will employee for a good
reason, a bad reason, or no reason at all: An employer may not discharge an at-will employee for refusing to perform an
illegal act. Sabine Pilot Serv., Inc. v. Hauck, 687 S.W.2d 733, 735 (Tex. 1985). Nor may an employer discharge an at-will
employee for investigating the legality of the requested act. Johnston v. Del Mar Distrib. Co., Inc., 776 S.W.2d 768, 771
(Tex. App.-Corpus Christi 1989, writ denied). Sabine Pilot and its progeny, Del Mar, require a plaintiff relying on their
exceptions to the at-will employment doctrine to bear the burden of proving that the discharge was for no reason other than
an unwillingness to perform an illegal act or the instigation of an investigation of illegality. Sabine Pilot, 687 S.W.2d at
735. An employer who discharges an employee for investigating the legality of a requested act ultimately found to be legal
cannot be liable for wrongful discharge. Ran Ken, Inc. v. Schlapper, 963 S.W.2d 102, 105 (Tex. App.-Austin 1998, pet.
denied). Nor can an employer who discharges an employee both for refusing to perform an illegal act and for a legitimate
reason be liable for wrongful discharge. Tex. Dep't of Human Servs. v. Hinds, 904 S.W.2d 629, 633 (Tex. 1995). 

1. The Wrongful-Termination Claim: 


Circumstantial Evidence




 Where no direct evidence proves a vital fact, we uphold a jury's finding from circumstantial evidence as long as the jury
fairly and reasonably could infer the finding from the facts. Blount v. Bordens, Inc., 910 S.W.2d 931, 933 (Tex. 1995) (per
curiam). A jury may consider circumstantial evidence, weigh witnesses' credibility, and make reasonable inferences from
the evidence it chooses to believe. Benoit v. Wilson, 239 S.W.2d 792, 796-97 (Tex. 1951). Circumstantial evidence may
establish any material fact. Browning-Ferris, 865 S.W.2d at 928. In reviewing circumstantial evidence for legal or factual
sufficiency, we do not look at any individual piece of circumstantial evidence in isolation. Felker v. Petrolon, Inc.,
929 S.W.2d 460, 464 (Tex. App.-Houston [1st Dist.] 1996, writ denied); Brinegar v. Porterfield, 705 S.W.2d 236, 238-39
(Tex. App.-Texarkana), aff'd, 719 S.W.2d 558 (Tex. 1986). Rather, we examine the totality of the known circumstances. 
Felker, 929 S.W.2d at 464; Porterfield, 705 S.W.2d at 238-39. 

2. The Wrongful-Termination Claim: 


The Equal-Inference Rule




 The "equal-inference rule" provides that a jury reasonably may not infer an ultimate fact from meager circumstantial
evidence that "could give rise to any number of inferences, none more probable than another." Pitzner,106 S.W.3d 724, at
*7 (quoting Hammerly Oaks, Inc. v. Edwards, 958 S.W.2d 387, 392 (Tex. 1997)). Thus, when circumstances are consistent
with either of two facts, and nothing shows that one is more probable than the other, neither fact can be inferred. Litton
Indus. Prods., Inc. v. Gammage, 668 S.W.2d 319, 324 (Tex. 1984). Further, while a jury may infer a material fact from
circumstantial evidence, the circumstantial evidence "must transcend mere suspicion." Browning-Ferris, 865 S.W.2d at
928. Finally, "in cases with only slight circumstantial evidence, something else must be found in the record to corroborate
the probability of the fact's existence or non-existence." Pitzner, 106 S.W.3d 724, at *13 (quoting Lozano v. Lozano,
52 S.W.3d 141, 148 (Tex. 2001)).

 

C. The Tortious-Interference Claim:


The Personal-Interest Requirement




 In issue three, Altheide asserts: (1) he conclusively proved the affirmative defense of legal justification; and (2) the
evidence is not legally sufficient or, alternatively, factually sufficient to support the finding that Altheide tortiously
interfered with D'Unger's contractual agreement with the Foundation. An at-will employment contract can be the subject of
a claim of tortious interference. Sterner v. Marathon Oil Co., 767 S.W.2d 686, 688 (Tex. 1990). The elements of a cause
of action for tortious interference with a contract are: (1) the existence of a contract subject to interference; (2) the
occurrence of an act of interference that was willful and intentional; (3) the act was a proximate cause of the plaintiff's
damage; and (4) actual damage or loss occurred. Holloway v. Skinner, 898 S.W.2d 793, 795-96 (Tex. 1994). The second
element is particularly important when the defendant serves the dual roles of corporate agent and the third party who
allegedly induces the corporation's breach. Id. at 796. In that event, to preserve the logically necessary rule that a party
cannot tortiously interfere with its own contract, the plaintiff must prove that the corporate agent's alleged interference was
in furtherance of the agent's personal interests, not the corporation's. Id. 

 The plaintiff meets this burden by showing that the agent acted in a fashion so contrary to the corporation's best interests
that only the agent's personal interests could have motivated the actions. Id. The mere existence of a personal stake in the
outcome cannot alone constitute proof the corporate agent committed an act of willful or intentional interference. Id. In
other words, the plaintiff must show that the agent acted solely in furtherance of the agent's own interests. Id.; Powell
Indus., Inc. v. Allen, 985 S.W.2d 455, 457 (Tex. 1998) (per curiam). Once the plaintiff meets its burden, liability for
tortious interference with a contract is established unless the corporate agent proves the affirmative defense of legal
justification. Holloway, 898 S.W.2d at 796; see Kingston v. Helm, 82 S.W.3d 755, 763 n.3 (Tex. App.-Corpus Christi
2002, pet. denied). 

 In addition, when a party acts through an agent, the act of an agent for a principal may not subject the agent to liability for
tortious interference with a contract so long as the agent acts in good faith and believes that the action is for the best interest
of the principal. Holloway, 898 S.W.2d at 794-95. We must consider the principal's evaluation of the agent's action when
determining whether an agent acted against the principal's interests. Powell Indus., 985 S.W.2d at 457. A principal is a
better judge of its own best interests than a jury or court. Id. If a principal does not complain about its agent's actions, the
agent cannot be held to have acted contrary to the principal's interests. Id. "[E]ven such a corporate complaint is not
conclusive evidence that the agent was acting for his or her personal interests." Latch v. Gratty, Inc., 107 S.W.3d 543,
at *8 (Tex. 2003). 

 With the law in mind, I turn to a more detailed recitation of the facts than that provided by the majority. Trial of this case
lasted nine days. The clerk's record is comprised of eight volumes. The court reporter's record is seventeen volumes long.
Twelve witnesses testified before the jury. The parties introduced almost two hundred exhibits, many containing multiple
documents. The complex record and the exacting standards of review applicable to legal- and factual-sufficiency
challenges require a detailed recitation of the relevant facts. 

IV. REVIEW OF THE RELEVANT EVIDENCE PRESENTED TO THE JURY

A. The Foundation and Its Assets


 The jury learned that the Foundation was formed in accordance with the testamentary instructions of Ed Rachal, a South
Texas rancher and philanthropist. The Foundation is a non-profit charitable organization. Article four of the Foundation's
articles of incorporation recites the purposes for which it was chartered: 

 Said corporation is organized exclusively for charitable, religious, educational, literary, scientific, and for the prevention of
cruelty to children or animals. 



 In 1996, the Foundation converted from a non-operating foundation, which invested its assets, to an operating foundation. 
Designation as an operating foundation requires the Foundation to distribute to charities five percent of the market value of
its assets each year. Otherwise, it cannot maintain tax-exempt status. One of the Foundation's assets, the jury also learned,
is the Galvan Ranch in Webb County, Texas, north of Laredo. A unique but hostile habitat for a variety of wildlife, the
Galvan Ranch extends over 67,000 acres and is bordered along a five-mile frontage by the Rio Grande river. 

 Evidence introduced by both parties suggested that the crossing of ranch property by non-United States citizens is a
common occurrence. The jury also heard evidence that the corpses of transients who during their journey had succumbed
to the harsh environment had been found in the vicinity of the ranch. 

B. The Principal Witnesses


 Altheide and D'Unger, neighbors and formerly friends since 1985, each told the jury he was employed by the Foundation
after first having served as a paid consultant. For a time, the two men served together as members of the Foundation's
Board of Directors (the "Board"). Altheide continues to serve as an officer and member of the Board. John White
("White"), an attorney, also served as a member of the Board during D'Unger's tenure. White testified both as a fact
witness and as an expert on corporate governance practices. Scott Turner ("Turner"), a certified public accountant, testified
as an expert witness on damages and corporate governance practices, including self-dealing and the employment and
compensation of corporate officers. Ed DuBose ("DuBose"), a former law enforcement officer, truck driver, and bouncer,
was first a contract security guard for the Foundation and then acting foreman of the Galvan Ranch. Alfredo Martinez
("Martinez") was the border patrol agent-in-charge of the Laredo North Station, a region that encompasses the Galvan
Ranch. Darrin Matthews ("Matthews") was also a border patrol agent. 

C. Evidence Relevant to the Employer-Employee Relationship


between the Foundation and D'Unger




1. The Foundation-D'Unger Contractual Consultant Relationship


 One of the documents presented to the jury was a "Consulting Services Agreement," dated April 27, 1995, signed by the
Foundation and D'Unger. The parties agreed D'Unger would be compensated for his consulting services at the rate of $75
per hour, to be invoiced monthly by D'Unger. The consulting contract did not recite a definite duration. Rather, the
agreement expressly stated that "[e]ither party shall have the right to terminate this agreement upon notice to the other." 

2. The Foundation-D'Unger Director Relationship


 Corporate documents presented to the jury showed that an amendment to the Foundation's by-laws, adopted by the Board
on October 17, 1995, provided for five directors. D'Unger was elected as one of those five directors effective June 1, 1996.
At the time of D'Unger's election, directors of the Foundation volunteered their time. They did not receive compensation. 
As a result, D'Unger testified, a perception arose it would be a conflict of interest for him to act as a paid consultant to the
Foundation after his election as director. Accordingly, D'Unger notified the Foundation in writing of his termination of his
consulting contract. From June 1, 1996 through September 1, 1996, D'Unger performed the same work for the Foundation,
without compensation, he had performed as a paid consultant. 

 The Foundation's by-laws also provide for four regularly called Board meetings each year, once every three months, and
for special board meetings that may be called on proper notice as issues arise that require Board decision. With regard to
compensation of directors who also are employed by the Foundation, the Foundation's by-laws contain the following
provision: 

 2.10 Directors may receive salaries or other compensation for personal services actually rendered. The Board of
Directors may adopt a resolution providing for payment to directors of a fixed sum and expenses, if any, for attendance at
each meeting of the Board of Directors. A director may also serve the Foundation in any other capacity and receive
compensation for those services. Such compensation (whether payment or reimbursement of expenses, including
reasonable advances for expenses anticipated in the immediate future) must be in return for a director's performance of
personal services which are reasonable and necessary to carry out the exempt purposes of the Foundation. Such
compensation may not exceed what is reasonable under all the circumstances and must not be in excess of compensation
ordinarily paid for similar services by organizations like the Foundation and under like circumstances. The compensation
and scope of services provided by such a director shall be approved by an affirmative vote of a majority of the voting
directors other than the director whose services and compensation are the subjects of the vote, even though the number of
disinterested voting directors may be less than a quorum. 



 Also, article nine of the Foundation's articles of incorporation provide that "[n]o part of the net earnings of the corporation
shall enure to the benefit of or be distributed to its directors, officers or other private persons, except that the corporation
shall be authorized and empowered to pay reasonable compensation for services rendered . . . ." The articles of
incorporation also prohibit the Foundation from engaging in "self-dealing." 

 Further, the jury learned that article 4.01 of the Foundation's by-laws authorizes the Board to elect not only officers of the
Foundation but "other officers, assistant officers, agents, consultants and/or advisors, define the authority and duties of each
such position, and elect or appoint persons to fill the positions as they deem advisable from time to time." The jury also
heard that Altheide and D'Unger were elected officers of the Board (president and secretary, respectively) in addition to
their operational offices. Altheide testified that D'Unger refused to recognize any distinction between the scope of duties
and authority of elected directors, officers of the Board, and the Foundation's appointed operating officers. D'Unger
testified that the roles were "intertwined" and charged that Altheide wanted to run the Foundation as a "one-man show." 

3. The Foundation-D'Unger Operating Officer Relationship


 Minutes of a Board meeting held on October 22, 1996 recited as follows with regard to D'Unger's appointment as an
operating officer of the Foundation:

 Thereafter, reasonable compensation for the services of Claude D'Unger was considered. Claude left the meeting so his
compensation could be discussed. After considering all the relevant factors, including Claude's qualifications and the scope
of his duties as well as the recommendations of counsel for a salary range for Claude's position, John White moved to set
his salary at 80,000 per annum for full time employment effective September 1, '96, reduced proportionately to reflect the
actual time Claude devoted to the Foundation. The motion was seconded by Marianne Warner and unanimously approved
by those members present, including the two uncompensated Board members present and voting. The board approved
paying up to 400 per month for medical insurance premiums for his medical insurance coverage as Claude is the only paid
officer or employee of the Foundation who does not have current access to medical insurance through other employment,
along with a benefit package which would be set after further consideration at such time as Claude is able to devote
full-time to the Foundation activities. Claude was invited back to the meeting and his salary was announced. (Emphasis
added.) 



 Also presented to the jury were minutes of an annual meeting of the Board held August 12, 1997. Those minutes reflected:

 The next order of business was the ratification of the current operating officers. By unanimous consent of the board the
following operating officer positions were ratified: Paul Altheide, Chief Executive Officer; Claude D'Unger, Vice-President
of Exempt Purposes; and Marianne Roberts, Vice-President of Grants. 

The purpose of ratifying the operating officers' titles and positions, Altheide told the jury, was to clarify the lines of
authority between himself and D'Unger. D'Unger, on the other hand, testified that the purpose of the ratification was to
renew his employment as an operating officer of the Foundation for another year. The Foundation's officers were supposed
to work as a team, D'Unger told the jury, not in direct lines of authority, one to the other. This divergence in corporate
governance philosophy, the jury learned, ultimately lead to a complete disintegration of the personal and working
relationships between Altheide and D'Unger. 

4. The Foundation-D'Unger Employment Relationship


 D'Unger acknowledged to the jury that no written employment agreement evidenced the employer-employee relationship
between the Foundation and him. However, he indicated in the following testimony they did have an agreement:

 Q. Now, what kind of employment agreement did you have with the Foundation as of October 22, 1996?



 A. I had an agreement to work with the Foundation. They would compensate me, and the agreement was for the term of a year.



 Q. Okay. Now, we've heard some testimony about that you were a consultant?



 A. Yes.



 Q. What was the difference between the agreement you had as a consultant and the agreement you had that's reflected at
the minutes of October 22, 1996?



 A. The agreement I had as a consultant had an indefinite term, and it had a provision that it could be terminated at any
time by either party. The - the employment agreement with the Foundation was for a specific period of one year, and it
required an action of the Board of Directors to remove me. 

 D'Unger testified that his role as a compensated employee of the Foundation (that is, not as a consultant and not as a
volunteer director) was effective September 1, 1996. He told the jury he believed that an employment agreement was
"spelled out" in the Board minutes of the October 22, 1996 meeting. He "had an agreement with them," D'Unger testified. 
"They liked what I could do and offered to pay me for it. I came in. I did it, and they compensated me. There was an
agreement there." D'Unger further testified that the Foundation renewed his employment agreement for an additional year
(through August 31, 1998) at the annual meeting of the Board on August 12, 1997 when the Board ratified the Foundation's
current operational officers. 

 Turner, as D'Unger's expert on corporate governance, testified he believed that the by-laws of the Foundation required
officers not be terminated unless the termination was in the best interests of the Foundation. Also presented to the jury was
article 4.03 of the by-laws: 



 4.03 Any officer elected or appointed may be removed by the voting members of the Board of Directors whenever in their
judgment the best interests of the Foundation will be served thereby. The removal of an officer shall be without prejudice
to the contract rights, if any, of the officer so removed. Election or appointment of an officer or agent shall not of itself
create contract rights. (Emphasis added.)

 White, an attorney and Board member, testified that Altheide, as chief executive officer of the Foundation, had the
absolute authority to terminate D'Unger's employment. He told the jury:

 There was no employment contract in place. It was an at-will relationship, which is true of all the employees, including
Mr. Altheide. No one has a contract that guarantees them a time of employment nor that there were certain standards that
have to be met for us to terminate someone. And there was absolutely no question that given the circumstances, given his
authority, given the relationship of Mr. D'Unger and the Board that he had the absolute right to terminate him for no reason
at all or for a reason.



 White testified that the Board discussed Altheide and D'Unger's salaries at the Foundation's October 22, 1996 annual
Board meeting. White recounted for the jury: "We were conferring that they would be paid to do those tasks for that
amount of money. . . . There was no negotiated contract entered into."

 Similarly, Altheide testified that the Foundation did not enter into any employment agreement with D'Unger. He also told
the jury the Board did not hire D'Unger for any specific term of employment when it set D'Unger's annual salary at
$80,000.00. 

 In his expert opinion as a certified public accountant and consultant to corporations, Turner told the jury, it is not "unusual
for officers [of a company] to be hired on an annual basis" under "general auditing principles." While laborers are usually
hired on an hourly, weekly, or monthly wage, Turner further testified, corporate officers usually are hired on an annual
salary. 

D. Evidence Relevant to the Rift between Altheide and D'Unger


 

1. The First Fissure 


 After D'Unger's employment, both parties told the jury, Altheide, as chief executive officer, directed D'Unger, as vice
president of exempt purposes, to develop a long-range plan for the use of Foundation assets for exempt purposes, including
the Galvan Ranch. Completion of this assignment was necessary for the Foundation to be recognized as an operating
foundation for tax purposes. In January of 1997, the jury learned, D'Unger visited the Galvan Ranch as part of his duties. 
He introduced himself to DuBose, the contract security guard and acting ranch foreman. D'Unger told the jury that during
this initial meeting, DuBose casually mentioned to D'Unger he had "chased [undocumented immigrants] with dogs today." 
Shocked by this admission and the racist attitude of the Galvan Ranch's acting foreman, D'Unger told DuBose he should
not mistreat transients who came on the ranch and instructed him to stop. That same day, from the Galvan Ranch, D'Unger
informed the border patrol that a Galvan Ranch employee had bragged to him about chasing non-United States citizens
with dogs. He advised the border patrol to "keep your eye open for anybody with torn up clothes or dog bites." D'Unger
then received a telephone call from Altheide, who criticized D'Unger for getting into a disagreement with DuBose. Altheide
accused D'Unger of lying to the border patrol. Altheide insisted, D'Unger told the jury, the event "didn't happen." 

 Thereafter, beginning in January of 1997, other visitors to the Galvan Ranch reported to D'Unger that DuBose had made
statements to them he chased undocumented immigrants with dogs and fired gunshots over their heads so they would
abandon their food and water when they had to run and climb through the ranch's fence line. The visitors did not report
DuBose's comments to Altheide, but rather informed D'Unger, who had been their primary contact within the Foundation.
D'Unger testified that he did not report DuBose's other alleged comments to Altheide, either. "The impression was the door
was shut," D'Unger told the jury. 

 DuBose testified that he might have made the statements attributed to him but denied actually ever engaging in the
described conduct. He also swore he always humanely treated transients who appeared on ranch property. Altheide, in a
detailed diary that was introduced to the jury, recorded his discovery that at about 3:30 a.m. on July 10, 1997, DuBose had
"discharged his pistol in the air when two trespassers would not move away from the cattle guard area when he hollered at
them." 

 D'Unger testified that he continued to express his alarm that mistreatment of transient non-United States citizens, in
violation of both the law and the Foundation's mission, was occurring on the Galvan Ranch. The visitors to the ranch who
reported DuBose's alleged comments to D'Unger told the jury D'Unger appeared to have a good-faith concern about
DuBose's treatment of transient non-United States citizens. Altheide's response to D'Unger's concern, D'Unger testified,
was to instruct D'Unger verbally not to concern himself with DuBose. D'Unger understood Altheide's instruction to mean
he was to look the other way with regard to DuBose's treatment of transients on the ranch. Altheide testified he meant that
the management of ranch personnel, including DuBose, was Altheide's responsibility as chief executive officer, not
D'Unger's as vice president of exempt purposes. 

2. The Widening Gap


 Meanwhile, D'Unger also began to object to two other circumstances involving the Foundation's chief executive officer: 
(1) the Foundation's contracts with a construction company owned by a close personal friend of Altheide; and (2) Altheide's
use of the Galvan Ranch for personal recreational purposes. Both, D'Unger told the jury, involved "self-dealing" by
Altheide. D'Unger admitted to the jury he had no knowledge, at the time he questioned Altheide's relationship with the
construction company, whether Altheide received any financial benefit from the company. However, D'Unger testified, he
believed that Altheide's use of a close friend to perform services for the Foundation "looked bad" and was part of a larger
pattern of mismanagement by Altheide. D'Unger particularly objected to hunting parties Altheide arranged for friends and
family on wildlife preserves on the ranch, explaining that the hunting parties proved Altheide's inadequate wildlife
management experience for his job as chief executive officer of the Foundation. At a minimum, D'Unger continued,
Altheide should have paid fair market value for his personal use of the Galvan Ranch. 

 By interoffice memorandum dated January 15, 1997 to Altheide and copied to the other three board members, D'Unger
discussed and made recommendations regarding several other issues in connection with the Galvan Ranch: (1) the
existence of and potential for Foundation liability associated with a cess pool on the ranch; (2) the disposal of trash and
scrap metal from the ranch; (3) the pending expiration of DuBose's security guard contract; and (4) the relationship between
the Foundation and another charitable institute. As to renewing DuBose's contract as security guard at the ranch, D'Unger
recommended in the memorandum that "it would probably be appropriate to start considering qualified people to work
full-time for the Foundation at the ranch." 

 In response, by memorandum dated January 20, 1997, Altheide informed D'Unger:

 Your memo does not follow proper channels. All of the subjects mentioned should have been discussed with me in person
prior to any correspondence with the board as a whole or more specifically John White and Robert Walker. If you are not
aware, note that volunteer directors have a different level of liability than do paid officers and directors. Involving them
beyond policy and budgetary levels exposes them to additional liability. 

D'Unger replied by memorandum, also dated January 20, 1997: "It is neither proper nor appropriate for any party to attempt
to stifle a flow of information among directors." 

 During a Board meeting following this exchange of memoranda, D'Unger voted "no" to a resolution to ratify two contracts
between the Foundation and the construction company with which D'Unger charged Altheide was affiliated. "It's a conflict
for you," D'Unger told Altheide. 

 As a director, Altheide testified, D'Unger had the right to vote against the resolution. Pursuant to the Foundation's by-laws,
Altheide further explained, "an individual director has the right to bring any matter relating to the organization to the
attention of a duly called meeting of the board of directors." If the matter was "so urgent that it couldn't wait for a regular
Board meeting," he added, "all they had to do was take it to one other Board member. Two Board members can
immediately require a Board meeting, so that's the proper way to do it." Accordingly, in a specially called Board meeting
held February 11, 1997, D'Unger presented his questions regarding Altheide's "self-dealing." 

 In response to D'Unger's expressed concerns, the Board adopted a conflict-of-interest policy. Minutes of the Board
meeting held February 11, 1997 were presented to the jury. The minutes showed that Altheide disclosed to the Board he
was a personal friend of the owner of the construction company as well as partners with the owner in an unrelated business
venture. Altheide represented he had no business interest in and derived no financial benefit from the construction
company. The minutes reflected that the Board confirmed that Altheide had fully disclosed the nature of his relationship
with the construction company and its owner. The minutes recited that the work performed for the amount charged was fair
to the Foundation. The Board approved and ratified the Foundation's contracts with the construction company. Altheide
abstained from the vote. 

 Also in response to D'Unger's concerns, this time with regard to Altheide's personal use of the Galvan Ranch, Altheide
proposed personnel policies for the Board's consideration. Included was a proposed policy for "Facility and Asset Use":

 The deminimus use of any Foundation facility or asset by staff members will be considered part of their compensation. 
This use will be coordinated and controlled by the CEO. Under no circumstances will staff use interfere with the normal
operation of the Foundation. Such use will be conducted so as to cost the Foundation no additional expense.



 The CEO will pay $ annually for the privilege of inviting guests to the ranches. This payment is made solely for the
purpose of insuring that the CEO obtains no improper personal benefit and complies with Internal Revenue Service rules. 

 Minutes of a Board meeting held May 13, 1997 reflected that D'Unger objected to the "Facility and Asset Use" policy
proposed by Altheide. The "Facility and Asset Use" policy was not adopted. Instead, the proposal was to "be considered at
a later time." 

 The Board did adopt other personnel policies proposed by Altheide. Included was the following:

 All items of the CEO's benefits and compensation will be determined by a special committee of the board of directors. 
The committee will be made up of all non-salaried members and ex-officio members. Their decisions will be
communicated to the CEO by letter and incorporated in the minutes of the next meeting of the board. 



Based on a report from one of White's law partners, the compensation committeeformed as a result of this policy set the
value of Altheide's personal use of the Galvan Ranch at $6,000 a year. 

 Next, by memorandum dated June 30, 1997 addressed jointly to D'Unger and the other Foundation directors, Altheide
informed the Board:

 On Thursday I was told an unidentified member of the board was conducting an "investigation" into the appropriateness of
our equipment acquisitions and some of the activities on the ranch. This news had a demoralizing effect on the ranch staff. 



 No board member has contacted me regarding equipment acquisitions or ranch activities. All equipment has been acquired
pursuant to board authorization and I am aware of no unauthorized ranch activities.



 An independent investigation by an individual board member is totally inappropriate. Questions of policy, procedure or
activity should be addressed to me. If a board member feels uncomfortable addressing the question to me then they should
call for a board meeting and discuss the matter there. 

 Meanwhile, Altheide told the jury, D'Unger gave him a preliminary draft of a long-range plan for development of the
Foundation's assets for exempt purposes. However, Altheide testified, D'Unger never completed the operational details
necessary for the Foundation to implement the plan. D'Unger admitted to the jury he had not finished the plan, but charged
that Altheide did nothing with the preliminary draft D'Unger had given him. 

 Soon, another encounter between DuBose and transient non-United States citizens came to D'Unger's attention. At the
time of the incident, DuBose was a contract worker and not an employee of the Foundation. DuBose told the jury that
about 6:00 a.m. on September 17, 1997, three Hispanic teenagers trespassed on the Galvan Ranch. They approached
DuBose's living quarters. For the trespassers' own safety and the security of ranch employees and DuBose's family,
DuBose said, a ranch hand helped him handcuff the three trespassers together and frisk them. DuBose estimated the boys
were between fifteen and sixteen years old. In compliance with Altheide's instructions that morning, which were consistent
with the way similar incidents in the past were handled, DuBose took photographs of the intruders. He called the border
patrol. The transients remained in DuBose's custody about three hours before the border patrol arrived and took them into
official custody. Telephone records presented to the jury showed calls from DuBose's telephone at the Galvan Ranch to the
border patrol the morning of September 17, 1997. 

 Border patrol agent Matthews testified that on September 17, 1997, he picked up three teenagers who were being detained
in handcuffs by DuBose on the Galvan Ranch. They were not abused or injured in any way, the agent told the jury. In his
opinion, there was nothing wrong with handcuffing trespassers on private property until authorities arrived to take custody
of them. Had Matthews detected any abuse or injury of the three teenagers, he would have reported it to local law
enforcement. Similarly, he would have reported to his agency, and ultimately to the Federal Bureau of Investigation, had he
received any complaint someone was chasing transients with dogs. 

 DuBose forwarded the photographs he had taken of the three teenagers to the Foundation's office. Shortly thereafter,
D'Unger testified, he reviewed DuBose's report to the Foundation of the September 17 encounter with the three young
transients. Although the handcuffing incident troubled him, D'Unger took no action at that time. His concern over DuBose's
treatment of transients on the Galvan Ranch grew. 

 By October 28, 1997, Altheide had recorded in his diary that "D'Unger must go, the sooner the better." In December of
1997, Altheide and White met and discussed D'Unger's termination. Also in December of 1997, Altheide increased his
own compensation by $6,000, the amount determined by the compensation committee Altheide was to pay the Foundation
annually for his personal use of the Galvan Ranch. Through the end of 1997, the jury learned, the growing disaffection
between Altheide and D'Unger was confined to clashes stemming from their conflicting philosophies about how the
Foundation should be managed and by whom. Unfortunately, events then took a more ominous turn. 

3. The Unbridgeable Chasm


 D'Unger told the jury he received a telephone call from the Webb County game warden in January of 1998. The record
does not reflect who or what event precipitated the call. The game warden told D'Unger that Martinez (the border patrol
agent-in-charge for the region) had no idea three teenagers had been detained by DuBose at the ranch the previous
September and picked up by the border patrol. D'Unger then personally spoke with Martinez, who confirmed there was no
record of the incident. 

 The jury learned that the paperwork ultimately was re-discovered in response to a request under the Freedom of
Information Act ("FOIA") submitted after D'Unger's termination. Reports filed by border patrol agents of the Immigration
and Naturalization Service ("INS") did confirm that the border patrol had taken custody of the three young trespassers from
DuBose that morning. One report indicated that the INS had determined that the teenagers were in this country illegally
and permitted them to return to Mexico. Nonetheless, Martinez confirmed to the jury, from January of 1998 through the
cessation of D'Unger's involvement with the Foundation in August of 1998, the agent informed D'Unger on several
occasions the INS could not locate any paperwork on the incident. (2) Martinez also told the jury he had not heard of any
shooting incidents at the Galvan Ranch, nor did he have any knowledge of the discovery of any bodies on the ranch. 

 D'Unger testified that it appeared to him the transients detained by DuBose in September had disappeared from the ranch. 
He said he believed that DuBose had lied to him about the boys' fate. At the same time, the jury learned, news sources
began to report stories about the mistreatment by local landowners of transient non-United States citizens, including rumors
of torture and murder. The reports fueled D'Unger's belief DuBose had mistreated transients on the Galvan Ranch. 
D'Unger contacted law enforcement authorities and other agencies. Beginning in January of 1998, D'Unger reported to
nine separate local, state, and federal agencies and officials with details of the September 17, 1997 handcuffing incident
and his fears for the well-being of the three teenagers. 

 In fact, D'Unger introduced documents to the jury that showed that his reports were not confined to allegations of
mistreatment on the Galvan Ranch of transient non-United States citizens. He repeated the questions he already had
expressed to the other directors of the Foundation about Altheide's "self-dealing" with regard to the Foundation's contracts
with the construction company owned by Altheide's friend. D'Unger reported his opinion that the $6,000 valuation of
Altheide's personal use of the Galvan Ranch was under market. He pointed out that Altheide was failing to pay even the
undervalued amount set by the Foundation's compensation committee, since Altheide gave himself a salary increase to
cover the expense. 

 D'Unger then went on to communicate with outside agencies information unrelated to the handcuffing incident or
Altheide's "self-dealing": (1) the Foundation's assistance of one of its employees in avoiding payment of court-ordered
child-support payments; (2) the feasibility of a receivership for the Foundation; (3) accounting and tax matters regarding
the Foundation; and (4) internal Foundation governance issues that centered on D'Unger's perceptions of Altheide's abuses
of authority. 

 D'Unger testified he believed that the prohibition in the corporation's by-laws against self-dealing and the requirement that
compensation paid to officers be reasonable required him as director and officer to correct the problems he perceived with
Altheide. However, D'Unger told the jury, his communications with outside entities regarding the Foundation's activities
violated Altheide's express instructions. Meanwhile, the Board convened a regular meeting on February 19, 1998. One of
the agenda items for the meeting was a proposed organizational chart and accompanying job descriptions. Altheide
testified that the purpose of the organizational chart and job descriptions was to clarify for D'Unger the lines and scope of
authority within the Foundation's operational management. The proposed organizational chart reflected that: (1) Altheide,
as chief executive officer, reported directly to the Board; and (2) as vice president of exempt activities, D'Unger reported to
Altheide. The position of "vice president - exempt purpose activities" was described as follows:

 1. Reports to and is supervised by the Chief Executive Officer.



 2. Responsible for developing comprehensive plan recommendations for exempt purpose activities.



 3. Responsible for developing recommendations for policies and procedures for the implementation of the exempt purpose
plan and activities. Policies are to be channeled through the Chief Executive Officer for Approval by the Board of
Directors; procedures are to be channeled through and approved by the Chief Executive Officer.



 4. Coordinates all exempt purpose activities.



 5. Responsible for developing budget recommendations for exempt purpose activities and monitoring the approved exempt
purpose activities budget.



 6. Supervises all Foundation employees who report to him.



 7. Performs such other duties assigned by the Chief Executive Officer.

 The minutes of the February 19, 1998 regular Board meeting also were introduced to the jury. Those minutes reflected:

 The CEO presented his report. Items in the CEO's presentation included a proposed organizational chart for the
foundation. At the request of Claude D'Unger the organizational chart was tabled to allow more time to review the
document and allow staff time to provide input. 



 Another item presented by the CEO was a proposed set of job descriptions for foundation staff employees. At the request
of Claude D'Unger, consideration of the proposed job descriptions was tabled to allow more time to review the document
and allow staff time to provide input. 

In addition, the February 19 minutes reflected, by a vote of four to one:

 The board approved a policy entitled ED RACHAL FOUNDATION LAW ENFORCEMENT ACCESS POLICY
providing for law enforcement access to the ranches. The policy provides for the CEO to be the only person to have the
authority to allow law enforcement personnel to enter foundation property. 

The jury learned that D'Unger voted in favor of adoption of the law enforcement access policy. 

 In April of 1998, Altheide learned of D'Unger's disclosures to law enforcement and other agencies of the September 17,
1997 handcuffing incident. Any surviving personal or working connection between D'Unger and Altheide disintegrated
completely at that time. On April 13, 1998, Altheide suspended D'Unger's employment with the Foundation. The jury
learned from a memorandum of that date that Altheide informed D'Unger of the following:

 I received a call from a representative in the Mexican Consulate office in Corpus Christi. This person asked for you and
then finding you not here asked if I could provide some information about the Foundation. I provided him the information
he requested and then inquired as to the purpose of his inquiry. He responded that he was trying to gather more information
so that he could respond to the statements and concerns you expressed during your visit to the consulate. He indicated that
you were concerned about incidents that took place on the Galvan where Mexican citizens were detained. 



 I and the Board have tried to respond to your concerns in the past. It is my belief that all appropriate action has been taken
by myself and the Board on each occasion that you have raised concerns of any type. I am surprised that you would take it
upon yourself take [sic] such action without first bringing it to the Board's attention and giving the Board an opportunity to
act. 



 You have been cautioned about independent activities in the past. You have also been informed and cautioned about the
use of proper channels. You have also received information and instruction about using your title and position to imply
authority to act on behalf of the Foundation when in fact you have no such authority. I consider this incident a direct
violation of all these previous instructions and advise [sic]. 



 Due to your disregard for appropriate instruction and normal business procedures your employment with the Ed Rachal
Foundation is hereby suspended until such further time as the Board reviews this situation and makes a determination
regarding your employment status.



 You are further instructed not to discuss Foundation business with any inappropriate party. 



 You are further instructed to provide the Board with a narrative describing all contact with all authorities with regards to
any Foundation business or activity. 



 You are further instructed to suspend all activities on behalf of the Foundation until further notice. 



 These instructions are effective immediately. I will notify you when the Board will meet. The meeting will be set in such
a manner as to get full participation. 



 The jury learned that the suspension did not affect D'Unger's status as a member of the Board. Both his compensation and
his communications with outside entities regarding the Foundation's activities continued. On April 17, 1998, at a special
meeting of the Board, D'Unger presented his concerns regarding activities at the Galvan Ranch. The Board met again at a
regular meeting in May of 1998. It formed a committee to investigate D'Unger's allegations. Neither D'Unger nor Altheide
was appointed to the investigating committee. Ultimately, the jury learned, members of the committee investigated
D'Unger's allegation that DuBose mistreated transient non-United States citizens on the Galvan Ranch. 

 Throughout his suspension, D'Unger continued to communicate with law enforcement and other agencies regarding the
Foundation's activities and what he perceived as Altheide's efforts to include him in a conspiracy to cover up criminal and
illegal conduct. Documents introduced to the jury showed that D'Unger met with the Consulate General of Mexico on June
8, 1998. He provided to law enforcement and other agencies copies of documents as well as information, including
attorney-client confidential information regarding litigation in which the Foundation was involved. 

 At long last, the jury learned, in June of 1998 one of the agencies contacted by D'Unger (the Office of the Texas Attorney
General) visited the Foundation's office and reviewed the Foundation's books and operations. The investigators
recommended how the Foundation's operations could be improved but took no action against the Foundation. Also,
documents presented to the jury showed that the Attorney General's office concluded that the Foundation had not engaged
in any illegality with regard to the employee with unpaid child-support obligations. 

 "Working conditions at the office," D'Unger wrote in a letter introduced to the jury, "are impossible and are about a breath
away from a major brawl." On August 10, 1998, Altheide asked D'Unger to resign. When D'Unger refused, Altheide fired
him. The next day, August 11, 1998, D'Unger decided not to submit his name for re-election as a director at the Board's
annual meeting. A new slate of directors was proposed and unanimously elected. At that point, D'Unger testified, a special
meeting of the new Board was convened. D'Unger, as a former director, was excluded. Minutes of the August 11, 1998
special meeting, introduced to the jury, reflected that the Board unanimously: (1) appointed operating officers, including
Altheide as chief executive officer but not including D'Unger in any capacity; (2) amended the Foundation's by-laws to
decrease the number of directors from five to four; and (3) ratified the scope of Altheide's duties as chief executive officer.
D'Unger was no longer a director, officer, or employee of the Foundation. 

 Undeterred, in a letter dated August 12, 1998 to the Consulate General of Mexico, D'Unger complained again about the
three teenagers he still thought of as missing. From the letter, the jury learned that D'Unger alleged that the Office of the
Texas Attorney General "either suffer[s] from a severe ineptitude or the integrity of the office has been compromised." The
next day, August 13, 1998, D'Unger complained in a letter to his congressman's office of the "lack of interest and candor"
of the INS and that "[t]he response to the Mexican Government inquiry on the matter by a ranking border patrolman on the
matter was interesting if not outright deceitful." 

 D'Unger explained his actions to the jury by noting that the Foundation's chartered purpose and moral mission included the
prevention of cruelty to children. The Corporation's charter, D'Unger added, supported his pursuit of information regarding
the fate of the three juveniles detained by DuBose as well as his complaint to the Office of the Texas Attorney General that
the Foundation was assisting an employee to evade child-support obligations. 

 Altheide's response to D'Unger's efforts, D'Unger testified, was first to suspend and ultimately to terminate him for "going
to the authorities." The Foundation and Altheide responded to D'Unger's allegation with a litany of reasons why D'Unger
was terminated. The list included D'Unger's failure to follow proper lines of authority, his volatility, his irrational behavior
and, among other job-performance deficiencies, his failure to finalize a long-term exempt use plan for the ranch. D'Unger
countered by charging that Altheide acted solely in Altheide's own interest in terminating D'Unger, solidifying Altheide's
control over the Foundation and rendering its assets ripe for plundering. Since his termination, D'Unger pointed out to the
jury, the Foundation's charitable contributions have shrunk, while the compensation paid to officers and directors has
grown. 



V. ANALYSIS

A. The Employment-Contract Claim: 

Application of the At-Will Employment Doctrine to the Facts


(First and Second Issues Presented)



1. Legal-Sufficiency Analysis


 The jury found that the Foundation agreed to an employment contract that limited its right to terminate D'Unger. (3)

 In this section of my analysis, I would consider only the evidence and inferences that support the finding. Lenz, 79
S.W.3d at 19;Maxus, 766 S.W.2d at 276. I would disregard all evidence and inferences to the contrary. Lenz, 79 S.W.3d at
19; Maxus, 766 S.W.2d at 276. The Foundation did not bear the burden of proof at trial on modification of D'Unger's
at-will status. Larson, 64 S.W.3d at 518; Rios, 930 S.W.2d at 814-15. Rather, D'Unger was required to prove that the
Foundation unequivocally indicated a definite intent not to terminate him except under clearly specified circumstances. 
Jones, 92 S.W.3d at 487. Therefore, I would analyze the legal-sufficiency challenge in the Foundation's first issue as a
no-evidence issue. Gooch, 902 S.W.2d at 183. The Foundation must show that the record presents no probative evidence
to support the adverse finding. See Croucher, 660 S.W.2d at 58. 

 I have reviewed the record. D'Unger testified that the Foundation entered into a renewable one-year employment
agreement with him that the Board ratified in 1996 and renewed in 1997. He pointed to the Foundation's by-laws and
corporate minutes as evidence of the parties' oral agreement. Turner, D'Unger's expert witness, testified that the existence
of an annual renewable employment agreement between the Foundation and D'Unger was consistent with generally
accepted accounting practices and corporate governance standards regarding how corporate officers are employed and
compensated. 

 The Foundation's by-laws provide that "[e]lection or appointment of an officer or agent shall not of itself create contract
rights." In light of that evidence, D'Unger's testimony about his understanding of the one-year, renewable term of his
employment with the Foundation, standing alone, will not support a finding that the Foundation agreed to an employment
contract that limited its right to terminate D'Unger. See Williams v. First Tenn. Nat'l Corp., 97 S.W.3d 798, 804 (Tex.
App.-Dallas 2003, no pet.) (holding, where employee handbook and employment offer letter disclaimed creation of
employment contract, that employee's testimony of his "understanding" of terms of agreement did not raise fact issue of
"specific, express, and clear agreement contradicting the express provisions of the personnel manual and the employment
offer letter."). D'Unger was required to present probative evidence to the jury of a specific, unambiguous agreement that
contradicted the express provision of the Foundation's by-laws that his appointment by the Board as vice president of
exempt purposes did not create any employment contract rights. See id. He did not. I agree with the majority that his
statement of subjective belief is not evidence. See Cont'l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 452 (Tex. 1996);
see also In re Jones, 974 S.W.2d 766, 769 (Tex. App.-San Antonio 1998, orig. proceeding); see generally Calvert, 38 Tex.
L. Rev. at 362-63. 

 I also concur that Turner's expert testimony that D'Unger's understanding was consistent with corporate practices with
which Turner was familiar did not provide what D'Unger's testimony lacked: evidence of a specific, unambiguous
agreement. I agree with the majority that a conclusory statement, whether by a lay or expert witness, is not evidence. 
Wadewitz v. Montgomery, 951 S.W.2d 464, 466 (Tex. 1997). Certainly, courts long have considered evidence of the prior
practices of an employer with regard to a customary term of employment sufficient to support a finding of the existence of
an employment agreement:

 It is true that it was not expressly stipulated that the appellee should remain in the service one year, or for any definite
length of time; but the evidence shows that it was the custom of the corporation to employ a manager annually, and to
require of him a bond conditioned for the faithful performance of his duty. The jury had a right to conclude that, with a full
knowledge of this custom, the parties had it in mind and contracted with reference to that term of service.

Farmers' Union Co-Op. Clearance House of Rusk v. Guinn, 208 S.W. 362, 363 (Tex. Civ. App.-Texarkana 1919, no writ);
see Hoffrichter v. Brookhaven Country Club Corp., 448 S.W.2d 843, 846 (Tex. Civ. App.-Dallas 1969, writ ref'd n.r.e.).
However, Turner did not testify about the Foundation's specific custom or its practices in particular. He only testified that
D'Unger's understanding of the agreement between the parties was consistent with standard corporate practices. "Expert
opinions must be supported by facts in evidence, not conjecture." Pitzner,106 S.W.3d 724, at *12. Like the majority, I find
that Turner's opinion testimony carries no more probative weight than D'Unger's testimony of his subjective understanding
of the term of his employment. 

 D'Unger argues, under the so-called "English Rule," that the Board's approval of his compensation based on an annual
salary supplies the requisite specificity to meet his burden of showing that the Foundation modified his at-will status. He
points to section 2.10 of the by-laws, which gives the Foundation the authority to employ and reasonably compensate its
directors, as providing for compensation of employee-directors co-extensive with the term of office for the Foundation's
directors, which is one year. I have examined the by-laws and find no support for D'Unger's contention in this regard. 
D'Unger also points to the 1996 annual meeting minutes, which reflect that the Board approved an annual salary of
$80,000. 

 The Foundation responds that the English Rule did not survive Montgomery County Hospital District, 965 S.W.2d at
503-04. While this case was pending on appeal, the Texas Supreme Court eliminated any lingering doubt; the English Rule
is no longer viable. Jones, 92 S.W.3d at 487. An agreement for an annual salary does not modify an employee's at-will
status. Id. A hiring based on an agreement of an annual salary does not limit the employer's prerogative to discharge the
employee during the dictated period of employment. Id. Evidence that the Board approved D'Unger's compensation
calculated on an annual basis is not evidence that the Foundation agreed to modify D'Unger's at-will status. See id. 

 Like the majority, I conclude that evidence that the Foundation agreed to an employment contract that limited its right to
terminate D'Unger at will is "so weak as to do no more than create a mere surmise or suspicion of its existence." Kindred,
650 S.W.2d at 63. Stripped of the inference that approval of D'Unger's annual salary evidenced an agreement to a one-year
term of employment, neither D'Unger's testimony nor his expert's opinion established that the Foundation and D'Unger
came to a meeting of the minds that modified D'Unger's at-will status. See Larson,64 S.W.3d at 519; see also SCI Mgmt.
Corp., 29 S.W.3d at 268. No evidence in the record establishes that the Foundation agreed to a specific term of
employment, and no evidence establishes that the Foundation unequivocally indicated a definite intent to be bound not to
terminate D'Unger's employment except under clearly specific circumstances.

 Accordingly, like the majority, I would find that no more than a scintilla of evidence exists "that would enable reasonable
and fair-minded people to differ in their conclusions" about the existence of an employment agreement between the
Foundation and D'Unger that modified D'Unger's at-will status. See Moriel, 879 S.W.2d at 25. I also would hold that the
evidence is legally insufficient to support the finding that the Foundation agreed to an employment contract that limited its
right to terminate D'Unger. 

 However, I then would perform a factual-sufficiency analysis as well. In the event of reversal of our disposition of an
appeal on legal-sufficiency grounds, the supreme court must remand to this Court for our consideration of properly
preserved factual-sufficiency issues. See, e.g., Anderson v. Seven Points, 806 S.W.2d 791, 795 (Tex. 1991). Given the
factual complexity of this record and the closeness of the legal questions presented, I would be mindful of the long-term
interest of judicial economy and address appellants' factual-sufficiency challenges. 

 

2. Factual-Sufficiency Analysis


 In this section of my analysis, I would examine and consider all of the evidence, not only the evidence that supports the
employment-contract finding. See Maritime Overseas Corp., 971 S.W.2d at 406-07; see also Maxus, 766 S.W.2d at 275. 
In reviewing the evidence, I would keep in mind that it is the jury's role, not an appellate court's, to judge the credibility of
the evidence, assign the weight to be given to testimony, and resolve inconsistencies within or conflicts among the
witnesses' testimony. Corpus Christi Area Teachers Credit Union v. Hernandez, 814 S.W.2d 195, 197 (Tex. App.-San
Antonio 1991, no writ) (quoting Tex. Employers' Ins. Ass'n v. Jackson, 719 S.W.2d 245, 249-50 (Tex. App.-El Paso 1986,
writ ref'd n.r.e.)). Since the Foundation did not bear the burden of proof at trial on modification of D'Unger's at-will status,
I would analyze the factual-sufficiency challenge in the Foundation's first issue as an insufficient-evidence issue. See Rios,
930 S.W.2d at 814-15. Specifically, the Foundation must show that the record presents insufficient evidence to support the
finding that the Foundation agreed to an employment contract that limited its right to terminate D'Unger. See Gooch,
902 S.W.2d at 184. 

 Without assessing the witnesses' credibility or substituting my judgment for that of the jury, I would hold that the evidence
that the Foundation agreed to an employment contract that limited its right to terminate D'Unger at will is factually too
weak to support the finding. See Ritchey, 734 S.W.2d at 86-87 n.1. As instructed by the supreme court, I would then detail
all of the evidence relevant to the employment-contract issue and articulate why the finding is factually insufficient. See
Maritime Overseas Corp., 971 S.W.2d at 407. 

 In addition to the English Rule, D'Unger relies on Accubanc Mortgage Corp. v. Drummonds, 938 S.W.2d 135 (Tex.
App.-Fort Worth 1996, writ denied). InAccubanc, minutes of the employer bank expressly appointed the plaintiff employee
as bank president and chief executive officer for a specified term of twelve months, in addition to approving an annual
salary. Id. at 142. The bank terminated him a month later. Id. at 152. A jury found for the bank president on a
breach-of-employment-contract claim. Id. at 141-42. The court of appeals affirmed on both legal- and factual-sufficiency
grounds. Id. at 143. In this case, however, the minutes of the October 22, 1996 Board meeting did not expressly recite that
the Board agreed to employ D'Unger for one year. The only reference in the 1996 board minutes to any time period is the
annual character of the compensation approved by the Board. Similarly, the minutes of the Board meeting of August 12,
1997 recited only that the Board ratified D'Unger's position as vice president of exempt purposes. The minutes did not
recite that the Board renewed D'Unger's employment agreement for another year or for any other time period, either directly
or by inference. 

 D'Unger acknowledged that no written agreement existed between the Foundation and him. He admitted that in the
October 22, 1996 meeting no one promised him a job. He admitted that the Board merely hired him as an employee and set
his salary. White and Altheide, both directors and both present at the 1996 annual meeting in which D'Unger's salary was
approved, testified that the Board had no intention of modifying D'Unger's at-will status by setting an annual salary. The
record presents no evidence, either direct or inferential, of any probative force that the Foundation agreed to a renewable
one-year employment term in 1996 and to its renewal in 1997. See Jones, 92 S.W.3d at 487. 

 Further, the undisputed evidence reveals significant ambiguities in the terms of the employment arrangement between the
Foundation and D'Unger. A close reading of the 1996 annual meeting minutes on which D'Unger relies reveals two
conditions: (1) the Board approved "80,000 per annum for full time employment effective September 1, '96, reduced
proportionately to reflect the actual time Claude devoted to the Foundation"; (2) "along with a benefit package which
would be set after further consideration at such time as Claude is able to devote full-time to the Foundation activities." 
(Emphasis added.) D'Unger does not claim on appeal that the Board minutes constituted a written contract, only that the
minutes corroborated the oral employment agreement between the parties. Accordingly, I would not address whether the
minutes themselves formed an enforceable contract. However, the same minutes on which D'Unger relies to evidence
modification of his at-will status conclusively prove that the parties had not agreed to two essential terms at the time the
Board approved D'Unger's salary and benefits: (1) when D'Unger would begin to work for the Foundation full time; and
(2) the additional benefits he would receive after he did start full time. See Trend Exploration, 934 S.W.2d at 713; see also
Stinger v. Stewart & Stevenson Servs., Inc., 830 S.W.2d 715, 720 (Tex. App.-Houston [14th Dist.] 1992, writ denied)
("Since the time frame of approval could have been at any time in the future and for any amount of time, it was too
indefinite to be a binding contract."). 

 Moreover, D'Unger testified his written Consulting Services Agreement with the Foundation reflected an agreed $75.00
hourly rate. As to his salary as an employee, however, the record presents no direct evidence that D'Unger requested a
specific salary, nor is there evidence from which the jury could have inferred that he did so. To the contrary, the minutes of
the October 22, 1996 annual Board meeting recited that White recommended D'Unger's salary of $80,000, and the Board
accepted it based in part on "the recommendations of counsel for a salary range for Claude's position." In fact, the 1996
annual minutes recited that D'Unger left the room while the other Board members discussed his salary and employment, as
required by the Foundation's by-laws, and that his salary was announced when he returned to the meeting. Thus, the 1996
annual minutes affirmatively showed that no negotiation took place during the board meeting itself. Also, White testified
that D'Unger's salary was not negotiated. Therefore, in addition to the ambiguities raised about when D'Unger would start
full time and the benefits he would receive in the future, the evidence conclusively showed that a third significant term of
his employment was not negotiated: his salary. See Larson, 64 S.W.3d at 519; see also SCI Mgmt., 29 S.W.3d at 268. 

 Finally, as reflected in the written Consulting Services Agreement between D'Unger and the Foundation, the jury also had
before it evidence that the course of prior contractual dealings between the parties recognized that the parties had the right
to terminate their earlier contract at any time. Thus, the jury learned that D'Unger was an experienced businessman who
understood the importance of written contracts, knew about the at-will doctrine before his employment by the Foundation,
and yet did not commit to a written contract what he testified was a significant limitation: that the Foundation agreed to a
renewable one-year employment term. Also, as evidenced by the written Consulting Services Agreement, the jury learned
that the Foundation executed a written document when it intended to contract on a matter. Altheide and White testified that
the Foundation had no employment agreement with any employee during the time the Foundation employed D'Unger. 
Consistent with that testimony, no written employment agreement between the Foundation and any other employee appears
in the record. Altheide and White reiterated to the jury that all employee relationships with the Foundation, including
Altheide and D'Unger's, were at will. Significantly, as noted above, the Foundation's by-laws provide that "[e]lection or
appointment of an officer or agent shall not of itself create contract rights." 

 Thus, even according probative value to D'Unger's subjective belief and his expert's conclusory opinion as supporting the
finding that the Foundation agreed to an employment contract that limited its right to terminate D'Unger, I would conclude
that the finding is undermined by the following evidence: (1) express recitations, described above, in the 1996 and 1997
annual Board meeting minutes as well as in the Foundation's by-laws; (2) undisputed evidence that the parties did not come
to an agreement, at the time D'Unger was hired, about his full-time start date or the benefits he was to receive in the future;
(3) undisputed evidence that the amount of D'Unger's annual compensation was not the subject of negotiation by the
parties; (4) White and Altheide's testimony that the Foundation did not modify the at-will status of any of its employees; (5)
undisputed evidence that the Foundation did not enter into written employment agreements with any of its other employees;
and (6) in light of the parties' prior contractual dealings, the absence of a written contract between D'Unger and the
Foundation. After a thorough review of the entire record, I would hold that the evidence is factually insufficient to support
the finding that D'Unger and the Foundation agreed to an employment contract that limited the Foundation's right to
terminate its employee. 

 Only after having found the evidence both legally and factually insufficient to support the jury's finding of an employment
contract would I sustain the Foundation's first issue. Accordingly, I also concur with the majority's disposition of the
Foundation's second issue with regard to the award of attorney fees on D'Unger's breach-of-contract claim. See Tex. Civ.
Prac. & Rem. Code Ann. § 38.001 (Vernon 1997). 

 

B. The Wrongful-Termination Claim:


Application of the Exceptions to the At-Will Employment Doctrine to the Facts


 (Fifth Issue Presented)



 1. Legal-Sufficiency Analysis


 The jury also found that the Foundation terminated D'Unger's employment for the sole reason that he refused to perform an
illegal act. (4) I again would consider only the evidence and inferences that support the finding. See Lenz, 79 S.W.3d at 19;
see also Maxus, 766 S.W.2d at 276. I would disregard all evidence and inferences to the contrary. See Sabine Pilot, 687
S.W.2d at 735. The Foundation did not bear the burden of proof at trial on the wrongful-termination issue. See id. Rather,
D'Unger was required to prove that his termination was for no reason other than his unwillingness to perform an illegal act
or his investigation of the legality of the requested act. Id.; see Del Mar, 776 S.W.2d at 771. Therefore, I would analyze
the legal-sufficiency challenge in the Foundation's fifth issue as a no-evidence issue. See Gooch, 902 S.W.2d at 183. The
Foundation must show that the record presents no probative evidence to support the adverse finding. See Croucher, 660
S.W.2d at 58. Texas law does not provide D'Unger, as a private employee, a remedy if the Foundation terminated him for
reporting illegal activities in his workplace. Healthtrust, 967 S.W.2d at 403; Runge, 57 S.W.3d at 566. Instead, parsed into
its essential elements, D'Unger's wrongful-termination action placed the burden on D'Unger to prove that: (1) he was
terminated; (2) for the sole reason; (3) that he refused to commit; (4) an unlawful act. See Allen v. Powell, 989 S.W.2d
776, 778 (Tex. App.-Amarillo 1998), aff'd in part and rev'd in part sub nom., Powell Indus., 985 S.W.2d at 457 (affirmed
on Sabine Pilot grounds, reversed on tortious-interference grounds). Similarly, the elements of the Del Mar investigative
corollary to Sabine Pilot placed the burden on D'Unger to prove that: (1) he was terminated; (2) for the sole reason; (3) that
he investigated the legality; (4) of a requested act. See Del Mar, 776 S.W.2d at 771. For purposes of analyzing the
Foundation's legal-sufficiency complaint to the finding that the Foundation wrongfully terminated D'Unger's employment, I
would focus on the third, or "refusal," element of D'Unger'sSabine Pilot wrongful-termination claim and the fourth, or
"requested act," element of his Del Mar wrongful-termination claim. 

 I note that the word "refusal" is defined as "rejection of something demanded, solicited, or offered for acceptance." 
Webster's Third New Int'l Dictionary (1993), p. 1910. I would conclude that proof of the "refusal" element of a Sabine
Pilotwrongful-termination claim requires both probative evidence that the employer demanded, solicited, or offered for
acceptance that the employee commit an illegal act as well as probative evidence that the employee refused. See Sabine
Pilot, 687 S.W.2d at 735. Similarly, I would conclude that proof of the "requested act" element of a claim brought under
the Del Mar corollary to Sabine Pilot requires both probative evidence that the employer demanded, solicited, or offered
for acceptance that the employee commit an illegal act and probative evidence that the employee investigated in good faith
the legality of the requested act. See Del Mar, 776 S.W.2d at 771. Therefore, the element common to D'Unger's Sabine
Pilot and Del Mar claims is evidence of the Foundation's demand, solicitation, or offer for acceptance by D'Unger that he
commit an illegal act. 

 I have reviewed the record. The parties do not dispute that D'Unger was terminated. D'Unger did not present any direct
evidence to the jury that the Foundation demanded, solicited, or offered for acceptance by D'Unger that he commit an
illegal act. Rather, D'Unger relies on inferences drawn from the circumstances surrounding three communications from
Altheide, the Foundation's agent. 

a. The Circumstantial Evidence


 D'Unger first cites Altheide's June 30, 1997 memorandum advising the Board that an unidentified board member was
conducting an "investigation" into activities at the ranch. (5) The memorandum instructed the directors not to discuss
Foundation business with any "inappropriate" party. The same instruction appeared in Altheide's April 13, 1998
memorandum suspending D'Unger, on which D'Unger also relies. D'Unger also testified he had a discussion with Altheide
about firing DuBose in which Altheide instructed him not to concern himself with DuBose, which D'Unger understood to
mean he was to turn a blind eye to DuBose's mistreatment of transients on the ranch. (6) D'Unger told the jury that he
interpreted Altheide's directions generally as instructions that he was not to disclose to anyone any information about illegal
activity involving the Foundation and specifically as instructions that he was not to report to law enforcement any criminal
conduct by DuBose. 

b. The Equal Inferences from the Circumstances


 If it reasonably may be inferred from the circumstantial evidence presented to the jury that Altheide demanded, solicited,
or offered for acceptance by D'Unger that he commit an illegal act, there is some evidence to support the jury's finding of
wrongful termination. See Lozano, 52 S.W.3d at 149. Viewing the circumstances in their totality, I would find that
Altheide's instructions not to discuss Foundation business with any "inappropriate" party and that D'Unger was not to
concern himself with DuBose are as consistent with Altheide's legitimate exercise of his duties as chief executive officer of
the Foundation as they are with D'Unger's subjective belief that he was being asked to commit or conceal an illegal act. 
Thus, the circumstantial evidence D'Unger presented to the jury is at best consistent with either of two inferences, and
nothing shows that one is more probable than the other. See Pitzner, 106 S.W.3d 724, at *12; see also Litton Indus.,
668 S.W.2d at 324. 

 In Pitzner, a premises-liability case, the supreme court recently reaffirmed the continued viability of the equal-inference
rule articulated in Lozano, Hammerly Oaks,Continental Coffee, and Litton Industries. Pitzner,106 S.W.3d 724, at *7. This
Court had examined the circumstances under which a worker was injured and found that conclusions reached by the
worker's experts that the worker "reeled backward and off the roof because he had received an electric shock is not
speculative." Marathon Corp. v. Pitzner, 55 S.W.3d 114, 135 (Tex. App.-Corpus Christi 2001), rev'd, 106 S.W.3d 724
(Tex. 2003) (per curiam). In reversing on legal-sufficiency grounds, the supreme court held the evidence legally
insufficient to support the jury's finding that the condition of the premises proximately caused the worker's injuries. 
Pitzner, 106 S.W.3d 724, at *13. 

 The chain of equal inferences in Pitzner included whether the worker fell from the roof or was assaulted on the premises,
whether he came into contact with a high-voltage wire or not, and, completing the chain, whether or not the condition of the
premises was a substantial factor in causing the worker's injuries. Id. at *12. The supreme court concluded that
corroboration of "the probability of the fact's existence or non-existence" as required by the equal-inference rule was
absent. Id. at *13. 

 Here, D'Unger presented no direct evidence that Altheide demanded, solicited, or offered for acceptance by D'Unger that
he commit an illegal act. Rather, the wrongful-termination finding is dependent on inferences drawn from the surrounding
circumstances. While a factfinder properly may assess credibility and believe or disbelieve all or part of the evidence
presented, it is not free to choose between equally probable inferences. See id. at *7. If the jury reasonably could have
inferred from the circumstances that DuBose's treatment of undocumented immigrants on the Galvan Ranch was illegal, it
also could have inferred that DuBose's conduct was racist but not illegal. Continuing with the chain of inferences, if the
jury reasonably could have inferred from the circumstances that the acrimony in the workplace between Altheide and
D'Unger was a result of D'Unger's refusal to conspire with Altheide in concealing DuBose's illegal conduct, it also could
have inferred that the discord resulted from D'Unger's divergent views on Foundation governance issues and his repeated
refusal to accede to Altheide's authority, even on matters that had nothing to do with DuBose. Completing the inferential
chain, if the jury could have inferred that Altheide's instructions not to discuss Foundation business with any
"inappropriate" party and that D'Unger was not to concern himself with DuBose were demands, solicitations, or offers for
acceptance by D'Unger that he commit or conceal an illegal act, it also could have inferred that the instructions were
consistent with Altheide's legitimate exercise of his duties as chief executive officer of the Foundation. 

 Like the circumstances surrounding the worker's injuries in Pitzner, corroboration independent of inference is missing in
this case. See id. For example, evidence that DuBose had been charged with or convicted of assaulting or kidnapping the
three young transients, or that Altheide and DuBose had been charged with or convicted of conspiring to violate the rights
of transient non-United States citizens, would have supplied the required corroboration. However, there is no evidence that
any of the circumstances investigated by D'Unger were ever found to be illegal. See Schlapper, 963 S.W.2d at 105
(refusing to extend Sabine Pilot exception to termination of employee for investigating legality of requested act ultimately
found to be legal). To the contrary, the undisputed evidence showed that none of D'Unger's complaints resulted in any
action by any law enforcement or other agency at any time against either the Foundation or against DuBose or Altheide
personally. Nothing in the record corroborates D'Unger's suspicions. See Pitzner,106 S.W.3d 724, at *13. In the absence
of corroborating evidence, the circumstantial evidence in this case does not "transcend mere suspicion." See
Browning-Ferris, 865 S.W.2d at 928. However distasteful the facts, our obligation as an appellate court is to
dispassionately and rigorously apply the appropriate standards of review, within the scope defined by those standards, in
determining the sufficiency of the evidence. 

 Accordingly, I would find that D'Unger did not meet his burden of proving the essential fact that the Foundation, through
its agent Altheide, demanded, solicited, or offered for acceptance by D'Unger that he commit an illegal act. The only
evidence I find in support of the jury's wrongful-termination finding is D'Unger's testimony of his subjective interpretation
of Altheide's instructions. As with D'Unger's testimony regarding the term of his employment, D'Unger's statement of
subjective belief is not evidence. See Cont'l Coffee Prods., 937 S.W.2d at 452; see also In re Jones, 974 S.W.2d at 769. 

 "Where there is real evidence, we must uphold the jury verdict, but in cases such as this where there is only real suspicion,
we must overturn it." Browning-Ferris, 865 S.W.2d at 928. D'Unger's subjective opinion piles "speculation on speculation
and inference on inference." Pitzner, 106 S.W.3d 724, at *11. No more than a scintilla of evidence exists "that would
enable reasonable and fair-minded people to differ in their conclusions" about whether Altheide demanded, solicited, or
offered for acceptance by D'Unger that he commit an illegal act. See Moriel, 879 S.W.2d at 25. 

 The Sabine Pilot and Del Mar exceptions to at-will employment are narrowly drawn. Sabine Pilot, 687 S.W.2d at 735;
Del Mar, 776 S.W.2d at 771. I would conclude that the exceptions to termination-at-will, based on an employee's refusal to
perform an illegal act or investigation of the legality of the requested act, are not broad enough to encompass D'Unger's
conjectures about Altheide's instructions not to discuss Foundation business with any "inappropriate" party and not to
concern himself with DuBose. Accordingly, I would find that the evidence supporting the finding of wrongful termination
is no more than a scintilla. See Formosa Plastics, 960 S.W.2d at 48. I would find that evidence of the vital fact that the
Foundation demanded, solicited, or offered for acceptance by D'Unger that he commit an illegal act is "so weak as to do no
more than create a mere surmise or suspicion of its existence." See Kindred, 650 S.W.2d at 63. I dissent from the
majority's affirmance of the wrongful-termination finding on legal-sufficiency grounds. I would hold that the evidence is
legally insufficient to support the finding of wrongful termination. 

 

b. Factual-Sufficiency Analysis


 In this section of my analysis, I would examine and consider all of the evidence, not only the evidence that supports the
wrongful-termination finding. See Maritime Overseas Corp., 971 S.W.2d at 406-07. Since the Foundation did not bear the
burden of proof on the wrongful-discharge issue at trial, I would analyze the factual-sufficiency challenge in the
Foundation's fifth issue as an insufficient-evidence issue. See Sabine Pilot, 687 S.W.2d at 735. Specifically, the
Foundation must show that the record presents insufficient evidence to support the finding that D'Unger's discharge was for
no reason other than his unwillingness to perform an illegal act or his investigation of the legality of the requested act. See
Gooch, 902 S.W.2d at 184. 

 The Foundation's fifth issue on appeal asserts insufficiency of the evidence to support the wrongful-discharge finding only
on the ground that "D'Unger was not asked to commit an illegal act by the Foundation." The Foundation argues, however,
in support of its fifth issue, that "D'Unger was a disgruntled employee who rejected authority." The argument details the
Foundation's complaints regarding D'Unger's job performance. The supreme court instructs that we must consider a party's
arguments supporting each issue on appeal, not just the wording of the issue itself. Anderson v. Gilbert, 897 S.W.2d 783,
784 (Tex. 1995) (per curiam). Further, this Court long has applied a liberal briefing policy. Ottis v. Haas,
569 S.W.2d 508, 511 (Tex. App.-Corpus Christi 1978, writ ref'd n.r.e.). We construe each issue on appeal in light of our
understanding of the arguments made and authorities cited by the appellant. Id. Accordingly, for purposes of analyzing the
Foundation's factual-sufficiency complaint to the finding that the Foundation terminated D'Unger's employment for the sole
reason that he refused to perform an illegal act, I would focus on the second element of both D'Unger's Sabine Pilot
wrongful-termination claim and his Del Mar wrongful-termination claim: the sole reason for D'Unger's termination was
his refusal to perform, or his investigation of the legality of, the requested act. See Allen, 989 S.W.2d at 778; see also Del
Mar, 776 S.W.2d at 771. Under Texas law, the Foundation did not wrongfully terminate D'Unger if it discharged him for
a legitimate reason as well as for his refusal to perform an illegal act or his investigation of the legality of the requested act. 
See Hinds, 904 S.W.2d at 633. In reviewing the evidence, I again keep in mind that it is the jury's role, not an appellate
court's, to judge the credibility of the evidence, assign the weight to be given to testimony, and resolve inconsistencies
within or conflicts among the witnesses' testimony. Hernandez, 814 S.W.2d at 197. Without assessing the witnesses'
credibility or substituting my judgment for that of the jury, I would hold that D'Unger's testimony of his subjective belief
that the Foundation's sole reason for terminating him was because he "went to the authorities" is factually too weak to
support the finding of wrongful termination. See Ritchey, 734 S.W.2d at 86-87 n.1. I would then detail all of the evidence
relevant to the wrongful-termination issue and articulate why the finding is factually insufficient. See Maritime Overseas
Corp., 971 S.W.2d at 407. 

 Even if the evidence is legally sufficient that Altheide, as the Foundation's agent, had demanded, solicited, or offered for
acceptance by D'Unger that he commit an illegal act, the record contains no evidence, other than D'Unger's unsubstantiated
conviction, that his refusal to do so or his investigation of the legality of the requested act was the sole reason he was fired. 
See Sabine Pilot, 687 S.W.2d at 735; see also Del Mar, 776 S.W.2d at 768. To the contrary, D'Unger himself testified that
he was terminated because he "went to the authorities," a claim for which Texas law provides no remedy to D'Unger as a
private employee. See Hinds, 904 S.W.2d at 633. Further, D'Unger also testified to his subjective belief that Altheide's
motivation for terminating D'Unger was to permit Altheide to treat the assets of the Foundation as his own. D'Unger's
expert concluded that the termination was to eliminate D'Unger's challenge to Altheide's authority. That Altheide had other
motives for terminating D'Unger is evidenced by Altheide's diary entry on October 18, 1997, well before Altheide learned
in April of 1998 that D'Unger had been reporting to the authorities: "D'Unger must go, the sooner the better." Also,
Altheide and White met to discuss D'Unger's termination as early as December of 1997, again well before Altheide learned
of D'Unger's reports to outside agencies. 

 Moreover, the evidence is undisputed that D'Unger pursued complaints to nine separate local, state, and federal officials
and agencies about Foundation and Altheide activities he surmised were illegal, immoral, in violation of the purposes for
which the Foundation was chartered, or in violation of the Foundation's by-laws. The evidence is undisputed that at least
three of D'Unger's charges had no basis in fact. First, D'Unger's fears for the welfare of the three transient juveniles
detained by DuBose in September of 1997 proved to be unfounded. The true facts showed that the border patrol had taken
the three young men into custody, just as reported by DuBose. D'Unger could have corroborated DuBose's account of the
incident at the time D'Unger reported his concerns to the authorities by checking the ranch's phone records or by filing a
FOIA request. He did not. Not until after D'Unger's relationship with the Foundation terminated did he seek to verify his
suspicions. Second, D'Unger's accusations regarding Altheide's "self-dealing" with regard to the Foundation's contract with
Altheide's colleague's construction company also proved unfounded. The true facts showed that Altheide held no business
interest and derived no financial benefit from his friend's construction company. Moreover, the Foundation's board
concluded that the work done and amounts charged by the construction company were fair to the Foundation. Third,
D'Unger's reporting of the Foundation's "assistance" of an employee in avoiding payment of his child-support obligations
also proved to be unfounded. The Office of the Attorney General rejected the complaint. Finally, once again, there is no
evidence that these or any of D'Unger's other complaints resulted in any action by any law enforcement or other agency at
any time against either the Foundation or against DuBose or Altheide personally. 

 Similarly, the evidence is undisputed that D'Unger, without authorization and in violation of Altheide's instructions,
disclosed to third parties Foundation confidential documents and information, including privileged attorney-client
communications regarding pending litigation unrelated to D'Unger's complaints about Altheide and DuBose. Further,
D'Unger admitted he ignored Altheide's instructions. He admitted he did not consider Altheide his superior in the
Foundation's hierarchy. D'Unger's own words proved that the level of acrimony in the workplace between the two men was
severe: "Working conditions at the office are impossible and are about a breath away from a major brawl." 

 Finally, on February 19, 1998, well after D'Unger secretly began divulging to investigative agencies that Altheide was
instructing him to conspire to cover up criminal activity at the ranch, D'Unger voted for a corporate resolution that gave
Altheide unfettered authority to permit access to the ranch by law enforcement. D'Unger did not, at that time, suggest to the
Board he was being pressured to conspire with Altheide to conceal DuBose's illegal conduct. Both his vote for the
resolution and his silence before the Board at the February 19, 1998 meeting were inexplicably inconsistent with D'Unger's
charges that Altheide was covering up criminal activity on the Galvan Ranch at that very moment. 

 Each of the four possible bases for the jury's affirmative finding that the Foundation terminated D'Unger for his refusal to
perform an illegal act is predicated on the vital fact that D'Unger's refusal was the sole reason. (7) Thus, even according
probative value to inferences drawn from the circumstances and to D'Unger's subjective belief as supporting the finding
that the Foundation terminated D'Unger's employment for the sole reason that he refused to perform an illegal act, I would
conclude that the finding is undermined by undisputed evidence of other reasons for D'Unger's termination unrelated to
D'Unger's disagreements with Altheide regarding DuBose's conduct: (1) Altheide's motivation to remove an impediment to
his exercise of control within the Foundation; (2) D'Unger's disruptive and insubordinate conduct in other matters of
corporate governance and philosophy; and (3) D'Unger's unauthorized disclosure to third parties of information regarding
the Foundation in other matters, particularly privileged communications between the Foundation and its attorneys. 

 At most, the evidence shows that the Foundation discharged D'Unger for a legitimate reason as well as for his refusal to
perform an illegal act or his investigation of the legality of the requested act. See Hinds, 904 S.W.2d at 633. Accordingly,
the Foundation cannot be liable for wrongful discharge. See id. Also, D'Unger's approval of a board resolution conferring
on Altheide the sole authority to permit law enforcement access to the Galvan Ranch was inconsistent with his assertion
later that Altheide was pressuring him during that same time to commit an illegal act or to participate in a conspiracy to
conceal DuBose's illegal activities at the Galvan Ranch. I dissent from the majority's affirmance of the
wrongful-termination finding on factual-sufficiency grounds. After a thorough review of the entire record, I would hold
that the evidence is factually insufficient to sustain the finding that the Foundation terminated D'Unger's employment for
the sole reason that he refused to perform an illegal act. See id. Having found the evidence both legally and factually
insufficient to support the jury's wrongful-termination finding, I would sustain the Foundation's fifth issue. 

C. The Tortious-Interference Claim:


Application of the Personal-Interest Requirement to the Facts


(Third Issue Presented)



1. Legal-Sufficiency Analysis


 The jury found that Altheide tortiously interfered with D'Unger's contractual agreement with the Foundation (8) without a
good-faith belief that he had a right to do so. (9) I would hold that the evidence is both legally and factually insufficient to
support the finding of an employment contract between D'Unger and the Foundation that modified D'Unger's at-will
employment status, but I agree with the majority that an at-will employment agreement can be the subject of a claim of
tortious interference. Marathon Oil, 767 S.W.2d at 688. I again would consider only the evidence and inferences that
support the finding. See Lenz, 79 S.W.3d at 19; see also Maxus, 766 S.W.2d at 276. I would disregard all evidence and
inferences to the contrary. See Lenz, 79 S.W.3d at 19; see also Maxus, 766 S.W.2d at 276. Altheide did not bear the burden
of proof at trial on the tortious-interference claim. See Holloway, 898 S.W.2d at 795-96; see also Kingston, 82 S.W.3d
at 763 n.3. Therefore, I would analyze Altheide's legal-sufficiency challenge in his third issue as a no-evidence issue. See
Gooch, 902 S.W.2d at 183. Altheide must show that the record presents no evidence to support the adverse finding. See
Croucher, 660 S.W.2d at 58. Specifically, Altheide must show that the record presents no probative evidence to support the
essential fact that his alleged interference was in furtherance of his own personal interests, not the Foundation's. See
Holloway, 898 S.W.2d at 795. 

 I have reviewed the record. D'Unger argues that the evidence supports the conclusion that his termination was not in the
Foundation's best interest and thus was prohibited by the Foundation's by-laws. D'Unger's testimony and the opinion of his
expert was that Altheide acted in his own best interests, not the Foundation's, when he fired D'Unger. As with D'Unger's
testimony regarding the term of his employment and his belief he was terminated for going to the authorities, I agree with
the majority that D'Unger's statement of subjective belief of Altheide's motives is not evidence. See Cont'l Coffee Prods.,
937 S.W.2d at 452; see also In re Jones, 974 S.W.2d at 769. I also agree that his expert's conclusions are not evidence. 
SeePitzner,106 S.W.3d 724, at *12; see also Wadewitz, 951 S.W.2d at 467. 

 However, D'Unger also cites to evidence of the benefit Altheide derived from Altheide's personal use of the Galvan Ranch
and $6,000 salary increase to cover the value of that usage to the Foundation. Considering only the inference suggested by
D'Unger, that by firing D'Unger Altheide secured a benefit for himself with regard to continued use of the Galvan Ranch
and increased salary, D'Unger had to prove more than the fact that Altheide benefitted personally from firing D'Unger. See
Holloway, 898 S.W.2d at 798. He had to prove that Altheide acted willfully or intentionally to serve Altheide's personal
interests at the expense of the Foundation. See id. 

 D'Unger further asserts that the evidence shows that the Board did not ratify his termination as required by the
Foundation's by-laws. He argues that the Board's failure to ratify his termination is further evidence that Altheide acted in
his own personal interest in terminating D'Unger. Altheide responds that the Board ratified D'Unger's termination when it
ratified Altheide's acts as chief executive officer as reflected in the August 11, 1998 special meeting minutes. I read no
ratification in the minutes of Altheide's actions in firing D'Unger, only ratification of Altheide's position as chief executive
officer, a different proposition from ratifying the acts that Altheide had taken as chief executive officer. Nonetheless, the
evidence is undisputed that D'Unger did not seek election to a new term as director of the Foundation. It is undisputed that
the Board unanimously elected new directors and officers, a slate that did not include D'Unger. 

 Like the majority, I would find as a matter of law that the Board effectively ratified D'Unger's termination by not
re-electing D'Unger but rather electing other officers. The Foundation is the best judge of its own interests. See Powell
Indus., 985 S.W.2d at 457. The evidence is undisputed that the Foundation did not complain about Altheide's termination
of D'Unger. Like the majority, I would not find that Altheide acted contrary to the Foundation's interests. See id. D'Unger
failed to introduce probative evidence tending to prove that firing D'Unger was so contrary to the Foundation's best
interests that it could only have been motivated by Altheide's pursuit of his own personal interests. See Holloway, 898
S.W.2d at 798. No more than a scintilla of evidence exists "that would enable reasonable and fair-minded people to differ
in their conclusions" about whether Altheide furthered his own personal interests at the expense of the Foundation's in
firing D'Unger. See Moriel, 879 S.W.2d at 25. Accordingly, I also would find that D'Unger did not meet his burden of
proving each element of tortious interference. See Holloway, 898 S.W.2dat 795. Nor would I address Altheide's
affirmative defense of legal justification. See id. I would hold that the evidence is legally insufficient to support the finding
that Altheide tortiously interfered with D'Unger's at-will employment agreement with the Foundation. See id. 

2. Factual-Sufficiency Analysis


 In this section of my analysis, I again would examine and consider all of the evidence, not only the evidence that supports
the tortious-interference finding. See Maritime Overseas Corp., 971 S.W.2d at 406-07. Since Altheide did not bear the
burden of proof on the tortious-interference issue at trial, I would analyze the factual-sufficiency challenge in Altheide's
third issue as an insufficient-evidence issue. See Holloway, 898 S.W.2d at 795-96; see also Kingston, 82 S.W.3d at 763
n.3. Specifically, Altheide must show that the record presents insufficient evidence to support the vital fact that his alleged
interference was in furtherance of his own personal interests, not the Foundation's. See Holloway, 898 S.W.2d at 795. 

 In reviewing the evidence, I again would keep in mind that it is the jury's role, not an appellate court's, to judge the
credibility of the evidence, assign the weight to be given to testimony, and resolve inconsistencies within or conflicts
among the witnesses' testimony. See Hernandez, 814 S.W.2d at 197. Without assessing the witnesses' credibility or
substituting my judgment for that of the jury, I would hold that evidence of: (1) D'Unger's subjective belief and his expert's
conclusory opinion that Altheide furthered his own interests when he fired D'Unger; and (2) Altheide's personal benefit in
the form of a higher salary and continued use of the Galvan Ranch, is factually too weak to support the finding of the vital
fact that Altheide, in firing D'Unger, acted so contrary to the Foundation's best interests that the jury could infer that
Altheide's personal interests motivated his actions. See Holloway, 898 S.W.2d at 795. I would then detail all of the
evidence relevant to the tortious-interference issue and articulate why the finding is factually insufficient. See Maritime
Overseas Corp., 971 S.W.2d at 407. 

 I already have concluded that evidence of other reasons for D'Unger's termination undermined the finding that the sole
reason for D'Unger's termination was that he refused to perform an illegal act: (1) Altheide's motivation to remove an
impediment to his exercise of control within the Foundation unrelated to D'Unger's disagreements with Altheide regarding
DuBose's conduct; (2) D'Unger's disruptive and insubordinate conduct in other matters of corporate governance and
philosophy; and (3) D'Unger's unauthorized disclosure to third parties of information regarding the Foundation in other
matters, particularly privileged communications between the Foundation and its attorneys. Similarly, even according
probative value to D'Unger's subjective belief and his expert's conclusory opinion about Altheide's motives and to an
inference that Altheide benefitted personally from firing D'Unger, I would conclude that the finding that Altheide tortiously
interfered with D'Unger's at-will employment agreement with the Foundation is undermined by: (1) evidence that Altheide's
act in firing D'Unger was not contrary to the Foundation's best interests because of the existence of other reasons for
D'Unger's termination unrelated to DuBose's conduct; (2) the Foundation's ratification of Altheide's termination of D'Unger
by its election of other officers; (3) the absence of any evidence that Altheide's compensation, including his use of the
Galvan Ranch and increased salary to cover that expense, was unreasonable; and (4) the absence of any evidence that the
Foundation had complained about either Altheide's compensation or his termination of D'Unger. At best the evidence
proves that Altheide had "mixed motives" to benefit himself as well as the Foundation when he fired D'Unger, an
insufficient basis for imposing liability for tortious interference. See Holloway, 898 S.W.2d at 796. I would not find that
Altheide acted contrary to the Foundation's wishes. See Powell Indus., 985 S.W.2d at 457. To hold Altheide liable for
events about which the Foundation has not complained subverts "the basic principle that 'the person who induces the breach
cannot be a contracting party.'" Id. In any event, even if the Foundation had complained about Altheide's compensation or
D'Unger's termination, its complaints would not be conclusive evidence that Altheide acted to further his personal interests
by firing D'Unger. See Latch,107 S.W.3d 543, at *8. After a thorough review of the entire record, I would hold that the
evidence is factually insufficient to prove that Altheide tortiously interfered with D'Unger's at-will employment agreement
with the Foundation. See id. Only after having found the evidence both legally and factually insufficient to support the
jury's finding of tortious interference would I sustain Altheide's third issue. 

VI. CONCLUSION


 To summarize, I concur with the majority's disposition of the employment-contract and tortious-interference issues but
would hold that the evidence is factually as well as legally insufficient to support the findings that: (1) the Foundation
agreed to an employment contract that limited its right to terminate D'Unger; and (2) Altheide tortiously interfered with the
at-will employment agreement between D'Unger and the Foundation. I concur that D'Unger is not entitled to attorney fees. 
I dissent from the majority's affirmance and would hold that the evidence is both legally and factually insufficient to
support the wrongful-termination finding. I would not reach appellants' evidentiary and jury-charge issues. Accordingly, I
would reverse and render a take-nothing judgment in favor of both appellants. 

 

 ERRLINDA CASTILLO

 Justice





Concurring and Dissenting Opinion delivered

and filed this 29th day of August, 2003. 



1. But see Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998) (holding
that legal-sufficiency review is conducted by considering "all the record evidence" in light most favorable to prevailing
party, indulging every reasonable inference in that party's favor). A unanimous supreme court, without discussing the
analytical construct applied in Formosa Plastics, "reaffirmed the traditional and historical statement of the scope of review
[w]hen the court stated: '[w]e emphasize . . . that under a legal-sufficiency review, we must disregard all evidence and
inferences contrary to the jury's finding.'" W. Wendell Hall, Standards of Review in Texas, 34 St. Mary's L.J. 1, 160 (2002)
(quoting Lenz v. Lenz, 79 S.W.3d 10, 19 (Tex. 2002)). I apply the supreme court's most recent analytical construct. 

2. The incident date on the reports Martinez testified about was not correct. 

3. Question No. 3 in the jury charge read:



 Did CLAUDE D'UNGER and the ED RACHAL FOUNDATION agree to an employment contract that limited the
employer's right to terminate the employee?

 

 Answer "Yes" or "No"



 Answer: Yes



 INSTRUCTION



 An employer may limit its right to terminate the employee if it agrees to a specific term of employment.



 For such a contract to exist, the employer must unequivocally indicate a definite intent to be bound not to terminate the
employee except under clearly specific circumstances. 

4. Question No. 5 in the jury charge read:



 Was CLAUDE D'UNGER discharged from employment with the ED RACHAL FOUNDATION for the sole reason that
he refused to perform an illegal act?





 INSTRUCTION



 An employee is wrongfully discharged if the sole reason for his discharge was:



 (1) the employee sought to find out from proper authority if a requested act was illegal. The requested act need not have
been illegal, but the employee must have had a good faith belief that the requested act might be illegal, and such belief must
have been reasonable; or

 

 (2) the employee refused to participate in a criminal conspiracy. A criminal conspiracy occurs when a person, with intent
that a felony be committed, agrees with one or more persons that they or one or more of them engage in conduct that would
constitute the offense; and he or one or more of them performs an overt act in pursuance of the agreement; or



 (3) the employee, having knowledge of two or more persons conspiring to injure, oppress, threaten, or intimidate any
person in the free exercise or enjoyment of life or property, refuses to conceal and not to make known such matter as soon
as possible to some federal authority; or



 (4) the employee resists intentional harassment of his employer to hinder, delay, prevent or dissuade the employee's
reporting to a law enforcement officer of the United States the commission or possible commission of a federal offense. 



 Answer "Yes" or "No":



 Answer: Yes

5. D'Unger testified he was not the Board member who conducted that investigation. 

6. The record does not reflect when this conversation took place. 

7. See note 4. 

8. Question No. 1 in the jury charge read:



 Did PAUL ALTHEIDE intentionally interfere with CLAUDE D'UNGER'S employment agreement with the ED
RACHAL FOUNDATION? 



INSTRUCTION

 

 You are instructed that interference is intentional if committed with the desire to interfere with the agreement or with the
belief that interference is substantially certain to result.



 Answer "Yes" or "No"



 Answer: Yes

9. Question No. 2 in the jury charge submitted Altheide's affirmative defensive issue on good faith:

 

 Did PAUL ALTHEIDE interfere because he had a good faith belief that he had a right to do so? 



 Answer "Yes" or "No"

 

 Answer: No